**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ADOL OWEN-WILLIAMS )  )  Plaintiff, )  )  v. )  )  BB&T INVESTMENT SERVICES )  )  Defendants. ) | Case Number: 1:06cv00948  Honorable Colleen Kollar-Kotelly |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION**
**TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

NOW COMES Plaintiff, Adol Owen-Williams, by and through his undersigned counsel and hereby submits the following memorandum of law and points of authorities in support of his Opposition to Defendant's Motion to Compel Arbitration and Stay Proceedings.

### I.    BACKGROUND INFORMATION

The Complaint in this action was filed on April 21, 2006 after Defendant induced plaintiff to leave a lucrative position at Mass Mutual Insurance Company by entering into an employment agreement with Plaintiff after conducting two months of background checks, and then terminating the agreement days before the employment was to begin. Defendant filed a Notice of Removal on May 19, 2006.

Plaintiff first Communicated with T.J. Roccograndi of BB&T Investment Services, Inc., ("BB&T") regarding a position at BB&T sometime in late January 2006 while he was employed at Mass Mutual Financial Services. After a series of telephone interviews, Plaintiff interviewed in person with Mr. Roccograndi sometime in late January 2006.[1]  BB&T's background check of Mr.

---

[1] Mr. Owen Williams took an extended leave from his career in the financial services industry to sue his former employer Merrill Lynch. During this first interview, Mr. Owen-

Owen-Williams began around this time. In a follow-up interview on March 06, 2006 plaintiff filled-out a Pre-Hire Questionnaire.[2] On March 23, 2006 Mr. Roccograndi telephoned Mr. Owen Williams to offer him the job and Mr. Owen-Williams accepted. The next day Plaintiff received a one page employment contract that contained a job offer and a place to check "Accept" or "Reject" and a space to sign. *See*, Employment Agreement (hereinafter "Agreement"), attached hereto as **Exhibit A**. The Agreement does not contain an arbitration clause. Later, Plaintiff was sent a Protective Covenants Agreement, to sign and return. *See*, Protective Covenants Agreement, attached hereto as **Exhibit B**. The Protective Covenants Agreement is explicitly clear that it is not an employment contract. *See*, Protective Covenants Agreement, p 2 & 8. The arbitration clause Defendants seek to enforce is found in the Protective Covenants Agreement, not the Employment Contract.

From Plaintiff's initial January 2006 meeting with Mr. Roccograndi until he was offered, and accepted employment, BB&T conducted an extensive investigation into the Mr. Owen Williams background. The same day Mr. Owen-Williams accepted BB&T's employment offer he notified Mass Mutual Financial Services of his resignation.[3] Mr. Owen Williams was scheduled to start work with BB&T on Monday, April 17, 2006. On April 14, 2006 Mr. Owen-Williams was informed

---

Williams fully disclosed his protracted litigation with Merrill Lynch. During this interview, Plaintiff also disclosed serious legal problems he was having with a neighbor, Ms. Weldon. In Mid-March, Plaintiff was asked to submit more detailed information regarding his disputes with Ms. Weldon.

[2] BB&T's Pre-Hire Questionnaire consists of questions taken from the NASD form U4 and U5. This is a standard industry form that seeks information only pertinent to a candidates investment services industry history.

[3] After tendering his resignation, Mr. Owen-Williams continued with Mass Mutual for a couple of weeks, helping to reassign his clients and accounts to other investment advisors. BB&T knew Mr. Owen-Williams was reassigning his clients and accounts.

by Mr. Roccograndi that the offer of employment was rescinded and he was terminated from BB&T.[4]      After several attempts to reason with BB&T, Mr. Owen Williams filed the Complaint in this action and sought a Temporary Restraining Order to force BB&T to uphold the employment contract or at least refrain from filling Mr. Owen Williams' position. An injunction hearing was held on April 21, 2006 the same day the Complaint was filed and the Court issued a temporary injunction preventing BB&T from filling Mr. Owen Williams position. Another injunction hearing was held on May 8, 2006 and the Court declined to further enjoin BB&T.

Now, approximately one month after the Complaint was filed BB&T seeks to invoke an arbitration clause contained in the Protective Covenants Agreement.[5] Since the filing of Plaintiff's Complaint and before invocation of the arbitration clause, Defendant's have actively litigated this case. Two hearings on the record have taken place; Defendants have filed an Opposition to a Motion filed by Plaintiff; Defendants served document requests on Plaintiff and Plaintiff responded to the requests; Defendant served a subpoena upon, and noticed the Deposition of Ms. Weldon; Defendant noticed the Deposition of Adol Owen-Williams; Defendant served a subpoena upon, and noticed the Deposition the Corporate Representative for Mass Mutual Financial Group; and,

---

[4] Mr. Owen Williams was initially informed he was being terminated because of a trespassing charge dating back to 1987 while he was a student at Towson University when he was stopped by Campus Police for being in his girlfriends all-girls dormitory after hours. Since the filing of this Complaint BB&T has at various times offered several new reasons for terminating Plaintiff such as: The dispute with his neighbor Ms. Weldon, unsubstantiated claims of insurance fraud, anger management and the litigation against Merril Lynch. Additionally, BB&T has undertaken an extensive after-the-fact investigation into Mr. Owen-Williams background in an attempt to find information to justify wrongfully terminating Mr. Owen-Williams and causing severe injury.

[5] Defendant served Plaintiff with their Motion to Compel Arbitration and Stay proceedings at the second injunction hearing.

Defendant has filed an Answer.[6]

## ARGUMENT

Federal court decisions construing and applying the Federal Arbitration Act, 9 U.S.C. § 1 *et seq* may be regarded as persuasive authority in construing and applying the corresponding provisions of the District of Columbia Arbitration Act, § 16-4301 *et seq.*, so long as there is no material difference in the statutory language between the two acts. *Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916 (D.C. App. 1992).

**A.   THE FEDERAL ARBITRATION ACT (FAA) DOES NOT APPLY TO THE ARBITRATION AGREEMENT DEFENDANT'S SEEK TO INVOKE BECAUSE IT IS CONTAINED IN THE PROTECTIVE COVENANTS AGREEMENT AND NOT THE EMPLOYMENT CONTRACT**

The FAA applies to a claim if (1) there is a written agreement to arbitrate; and (2) the contract evidences a transaction involving commerce. 9 U.S.C. § 2 (1999); *see also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 274 (1995). The Protective Covenants Agreement necessarily fails the second part of this test because *it is not a contract evidencing a transaction involving commerce.*

An agreement to Arbitrate is treated like any other contract. *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126 (7th Cir. 1997), *citing Kresock v. Bankers Trust Co.,* 21 F.3d 176 (7th Cir. 1994). It is a basic tenet of contract law that in order for a promise to be enforceable against the promisor, the promisor must have given some consideration for the promise. *Gibson,* 121 F.3d

---

[6]Defendant filed an Opposition to Plaintiff's Motion for Temporary Restraining Order including a 15 page Memorandum of Law on Friday, May 5, 2006 and mentioned nowhere in the brief that it was interested in arbitration. It was only during the Hearing on May 8, 2006 that Defendant first expressed a desire to invoke the arbitration clause. Defendant continued to subpoena witnesses for depositions weeks after attempting to invoke the arbitration clause. As such, Defendant continued to litigate this case in the District of Columbia Superior Court and now the United States District Court for the District of Columbia.

at 1131. *quoting Shaw v. S.S. Kresage Co.*, 328 N.E.2d 775, 779 (Ind. Ct. App. 1975).  Here, the arbitration clause contained in the Protective Covenants Agreement is unenforceable because their was not a bargained for exchange.  Mr. Owen-Williams had already entered into an Employment Agreement prior to receiving the Protective Covenants Agreement.  *See*, **Exhibit A**.  The Protective Covenants Agreement is purely one-sided, no consideration is given in exchange for promises conferred by Mr. Owen-Williams.

The fact that the Protective Covenants Agreement is not an Employment Agreement or any other bargained for exchange is clear from the bold and underlined language contained in the second page and again on the eighth page above the signature line.

**EMPLOYEE ACKNOWLEDGES AND UNDERSTANDS THAT NOTHING SET FORTH IN THIS AGREEMENT CREATES OR IS INTENDED TO CREATE (OR TO BE CONSTRUED TO) CREATE ANY EMPLOYMENT CONTRACT OF ANY SPECIFIED TERM BETWEEN THE PARTIES.  RATHER, THE PARTIES AGREE THAT EMPLOYEE'S EMPLOYMENT IS CONSIDERED AT WILL AND MAY BE TERMINATED BY EITHER EMPLOYER AT ANY TIME, FOR ANY REASON AND WITHOUT NOTICE**.  *See*, **Exhibit B**, at pp. 3 & 8.  This language is unequivocal - the Protective Covenants Agreement is not an employment agreement.  Moreover, the Protective Covenants Agreement is not even a valid contract as there is no bargained for exchange.

In *Gibson* the court invalidated an arbitration provision contained in a document similar to BB&T's Protective Covenants Agreement titled, Associated Policy Manual.  *Gibson*, 121 F.3d at 1129.  This document was not an employment contract but rather was a supplemental document that employees had to sign during one of the post hiring meetings.  *Id.*  The Manual contained the

following language "[Manual] does not constitute a contract nor promise of any kind." *Id.* at 1128. The court held that this agreement was not enforceable because, "in order for [it] to be enforceable, there must be detriment to NHC [employer] or benefit to Gibson [employee] that was bargained for in exchange for Gibson's promise to arbitrate all disputes." *Id.* at 1131.

A very similar situation is present in the case *sub judice*. Plaintiff executed a one page Employment Contract presented to him on March 23rd, 2006. *See*, **Exhibit A**. It contained a box to check if he accepted the employment offer and a signature line to execute this document. *Id.* This document was intended to create an employer/employee relationship. *Id.* The March 23rd 2006 Employment Contract constituted a binding employment contract with the Defendant. Later, after executing and returning the Employment Contract by mail, Plaintiff was presented with another document called the "Protective Covenant Agreement." *See*, **Exhibit B**.[7] The Protective Covenants Agreement contains language very similar to the language of the Manual in *Gibson* - "**Employer acknowledges and understands that nothing set forth in this agreement creates of is intended to (or is to be construed to) create any employment contract**." Similarly to the Plaintiff in *Gibson,* Plaintiff in the case *sub judice* did not receive nor bargained for any consideration for signing the Protective Covenants Agreement. Neither did this document cause any detriment to the Defendant. Thus, under the principle established in *Gibson*, the arbitration provision of the Agreement should not be enforced.

---

[7] Defendant has taken to calling the Protective Covenant Agreement the "Employment Contract" however the language of the Protective Covenant Agreement clearly states in multiple places in bold and underlined letters: "**Nothing Set Forth In This Agreement Creates or is Intended to Create Any Employment Contract**." *See*, Protective Covenants Agreement, pp 2 & 8. Nothing could be clearer. No amount of labeling will transform the Protective Covenants Agreement into an Employment Contract.

**B.    BB&T HAS WAIVED ANY RIGHT THEY MAY HAVE TO ARBITRATION BECAUSE THEY HAVE BEEN ACTIVELY PARTICIPATING IN THIS LITIGATION**

By actively participating in this litigation Defendant has waived any right they may have had to arbitration.

> [T]he right to arbitration, like any other contract right, can be waived. A party waives his right to arbitrate when he actively participates in a lawsuit or takes other action inconsistent with that right. Once having waived the right to arbitrate, that party is necessarily in default in proceeding with such arbitration.

*Cornell & Company, Inc. v. Barber & Ross Company*, 360 F.2d 512, 513 (D.C. Cir.1966). The Complaint was filed on April 21, 2006 and a copy was placed in the hands of counsel for BB&T on this day. Defendant has waited over one month to seek to enforce an arbitration clause located in the Protective Covenants Agreement.[8] *See*, Protective Covenants Agreement, ¶ 8. During the period between the filing of the Complaint and Defendant's attempt to force arbitration, the parties have participated in two full-blown evidentiary hearings, under oath; extensive discovery including: serving document requests on Plaintiff to which Plaintiff responded; serving a subpoena upon, and noticing the Deposition of Ms. Weldon; noticing the Deposition of Adol Owen-Williams; serving a subpoena upon, and noticing the Deposition of Mass Mutual Financial Group; and, filing an Answer.

In *Cornell* the court took note that: "Before filing the present motion, appellant (1) moved for a transfer of venue to the Eastern District of Pennsylvania, (2) filed an answer to the appellee's complaint, filed a counterclaim, and (3) filed notices of depositions, took the deposition of an

---

[8] Defendant apparently attempted to file a Motion to Compel Arbitration on May 8, 2006, but the Court *sua sponte* denied the Motion because Defendant failed to observe D.C. Sup Ct. R. 12. In spite of having their earlier Motion to Compel Arbitration rejected, Defendant continued to subpoena witnesses for depositions after this date. As such, the effective date that Defendants attempted to invoke the arbitration clause is May 26, 2006.

official of appellee, and procured the production of various records and documents." *Cornell*, 360 F.2d at 415. Similarly, BB&T has filed numerous notices of depositions, procured the production of documents from Plaintiff and various third parties, scheduled depositions of 3rd parties under oath and filed an Answer.

"It is clearly the intention of Congress to provide that the party seeking to enforce arbitration can do so only when not guilty of dilatoriness or delay." *Radiator Specialty Co. v. Cannon Mills*, 97 F.2d 318 (4th Cir. 1938). The machinery of litigation has been invoked and Defendant should not be allowed to have it both ways by litigating this dispute until such time as it decides it prefers to arbitrate.

**C.   EVEN IF THIS COURT IS INCLINED TO FIND THAT THE PROTECTIVE COVENANTS AGREEMENT IS A BINDING CONTRACT, THE CONTRACT BY ITS TERMS MUST BE GOVERNED BY GEORGIA LAW, EFFECTIVELY INVALIDATING THE ARBITRATION CLAUSE**

Paragraph 7(d) of the Protective Covenant Agreement states as follows

<u>Governing Law: Interpretation</u>. This agreement shall be governed by the laws of the State of Georgia without regard to the conflict of law provisions of this state...

Any disputes, including the present one, should be decided under Georgia law. "(A)s a general rule, Georgia courts have been reluctant to enforce contractual arbitration clauses...Accordingly, a contract provision requiring arbitration will generally be enforced only if it "limits its applicability to questions such as the amount of loss or damage and requires arbitration as a condition precedent to a right of action upon the contract itself"." *Freeman v. C.W. Redfern Enterprises, Inc.*, 185 Ga. App. 205, 206, 355 S.E.2d 79, 81 (Ga. Ct. App. 1987) (*citing Savannah Transit Auth. v. Ledford*, 179 Ga. App. 238, 345 S.E.2d 915 (Ga. Ct. App. 1986) (citation omitted).

Clearly, the arbitration clause in the case *sub judice* is not as narrowly limited as required

by Georgia law.[9] Thus, under Georgia law the arbitration clause of the contract should not be enforced and arbitration should not be compelled. Far from limiting itself to narrow questions, the arbitration clause applies to: [A]ny and all disputes, disagreements, claims or other conflicts regarding relating to, or arising out of this Agreement. *See*, Protective Covenants Agreement, ¶ 8.

The Protective Covenants Agreement is not a binding contract in that it was not a bargained for exchange. However, if this Court is inclined to decree that the Protective Covenants Agreement is a binding contract, than the Arbitration Clause is still unenforceable under Georgia law.[10]

## CONCLUSION

Fore the foregoing reasons, Adol Owen-Williams respectfully requests that the Court deny Defendant's Motion to Compel Arbitration and Dismiss or Stay the Proceedings. A proposed Order is attached.

Respectfully Submitted,

_____/s/_____
Seann P. Malloy Bar No. 490343
Simmons & Associates, Chartered
7347 Wisconsin Avenue
Suite 200
Bethesda, Maryland 20814

---

[9] Plaintiff agrees with Defendant's assertion that the arbitration agreement is "broad." *Def. Memorandum*, p. 7. As such, under Georgia law the arbitration agreement is unenforceable because it does not limit its applicability to narrow issues.

[10] BB&T cannot pick and choose which provisions of the Protective Covenants Agreement they desire to have effect. BB&T drafted the document and insisted that Georgia law govern all aspects of the agreement. Thus they are bound by the choice of law provision they selected.

(301) 986-8444
(240) 597-0749 (Fax)