# EXHIBIT 1 (Part 1)

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

```
- - - - - - - - - - - - - - x
                           :
ADEL OWENS WILLIAMS,       :    Docket Number:  CA3084-06
                           :
           Plaintiff.      :
                           :
        vs.                :
                           :
BB&T INVESTMENT, INC.,     :
                           :
           Defendant.      :
                           :    Friday, April 21, 2006
- - - - - - - - - - - - - - x    Washington, D.C.
```

The above-entitled action came on for a hearing

before the Honorable ROBERT S. TIGNOR, Senior Judge, in

Courtroom Number JIC, commencing at 2:27 p.m.


APPEARANCES:

On Behalf of the Plaintiff:

SEANN MALLOY, Esquire
Washington, D.C.

On Behalf of the Defendant:

ALAN L. BRIGGS, Esquire
Washington, D.C.

HOLLY B. JAMES, Esquire
Washington, D.C.

06-00995

**Deposition Services, Inc.**
6245 Executive Boulevard
Rockville, MD 20852
Tel: (301) 881-3344  Fax: (301) 881-3338
info@DepositionServices.com  www.DepositionServices.com

# TABLE OF CONTENTS

## WITNESSES

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

**On behalf of the Plaintiff:**

Adel Theo Owen Williams

| | | | | |
|---|---|---|---|---|
| (By The Court) ........ | 15 | | | |
| (By Mr. Malloy) ....... | 23 | | 42 | |
| (By Mr. Briggs) ....... | | 31 | | |

**On behalf of the Defendant:**

Thomas James Roccograndi

| | | | | |
|---|---|---|---|---|
| (By Mr. Briggs) ....... | 47 | | | |
| (By Mr. Malloy) ....... | | 57 | | |

\* \* \* \* \*

## MISCELLANEOUS

Closing argument on behalf of the Plaintiff ...... 90

Closing argument on behalf of the Defendant ...... 97

Findings of the Court ........................... 102

## EXHIBITS

| | Marked | Admitted |
|---|---|---|

**On behalf of the Plaintiff**

| | | |
|---|---|---|
| No. 1 - Employment offer ............. | 5 | |

**On behalf of the Defendant**

| | | |
|---|---|---|
| No. 2 Letter of 3/28/06 .............. | 34 | |

lw

<u>P R O C E E D I N G S</u>

1

2          MR. STEVENS:  Calling the matter which appears

3   on the Court's calendar, this is in the matter of Adel

4   (phonetic sp.) Owen Williams versus BB&T Investment

5   Services, Inc.  This is 06 Civil Action 3084.  Could I

6   have the parties identify themselves starting with counsel

7   for the plaintiff, please.

8          MR. MALLOY:  Good afternoon, my name is Seann

9   Malloy.  I'm counsel for the plaintiff, Adel Owen

10  Williams.

11         THE COURT:  Mr. Malloy.

12         MR. BRIGGS:  Good afternoon, Your Honor.

13         THE COURT:  Good afternoon.

14         MR. BRIGGS:  My name is Alan Briggs.  I'm here

15  with Holly James.  We are counsel on behalf of the

16  defendant, BB&T Investments.

17         THE COURT:  Thank you.

18         MR. BRIGGS:  Yes, sir.  And I have with me Mr.

19  T.J. Roccograndi, R-O-C-C-O-G-R-A-N-D-I, on behalf of

20  BB&T.

21         THE COURT:  All right.  Mr. Malloy, your client

22  is seeking a temporary restraining order, is that correct?

23         MR. MALLOY:  Yes, Your Honor.

24         THE COURT:  And have you submitted a proposed

25  order?

lw

1    MR. MALLOY:  I have, Your Honor.  I've submitted

2 two proposed orders.

3    THE COURT:  Are they alternative orders or does

4 one supplement the other?

5    MR. MALLOY:  One of them is an alternative order

6 or would be considered one.

7    THE COURT:  Oh, I see, all right.  Bear with me

8 for just a moment.

9    (Pause.)

10    Now, I assume in terms of the factual

11 background, there is much which is not contested.

12    MR. MALLOY:  I think so but I don't know for

13 sure, Your Honor.

14    THE COURT:  Well, why don't we begin by way of a

15 very brief opening statement indicating what you expect

16 the facts will show in an evidentiary hearing.  It was an

17 employment contract, is that right?

18    MR. MALLOY:  That's correct, Your Honor.

19    THE COURT:  Is it reduced to writing?

20    MR. MALLOY:  It was, Your Honor.

21    THE COURT:  Do you have it there?

22    MR. MALLOY:  I do.

23    THE COURT:  Is it part of your pleadings?

24    MR. MALLOY:  It's not a part of my pleadings

25 today, Your Honor, but I do have a copy of it.

lw

1          THE COURT:  Well, why don't we have it marked as

2    an exhibit because certainly it's at the heart of all this

3    I would think.

4          MR. MALLOY:  Bear with me --

5          THE COURT:  And you have a copy, Mr. Briggs?  Do

6    you have a copy of it?

7          MR. MALLOY:  No.

8          THE COURT:  All right.  Well show it to Mr.

9    Malloy if you are in agreement that that is the contract.

10    So, Mr. Malloy, are you satisfied that that is the

11    contract?

12          MR. MALLOY:  I am, Your Honor.  In addition to

13    this --

14          THE COURT:  Well why don't we have that marked

15    either as plaintiff's exhibit or Court's exhibit?  Do you

16    want it marked as a plaintiff's exhibit?

17          MR. MALLOY:  Yes, please, mark is as a

18    plaintiff's exhibit.

19                    (Plaintiff's Exhibit No. 1 was marked

20                     for identification.)

21          THE COURT:  And at some point Mr. Stevens

22    (phonetic sp.) will make a copy of everything that's

23    marked as an exhibit.  Copy will be part of the Court

24    record and the original will be returned to whoever

25    submitted it.  May I see that?

lw

1          (Pause.)

2          Now this purports to be an offer and I see

3    there's a signature at the bottom and there is checked

4    accept.  Is that Mr. Owen Williams' signature on the

5    bottom?

6          MR. MALLOY:  Yes, it is, Your Honor.

7          THE COURT:  This is the acceptance, all right.

8    Here's the offer-acceptance, contract.  So at least

9    everyone's in agreement that this is the offer.  This is

10   the acceptance.  This is the contract, is that right?

11         MR. BRIGGS:  Yes, Your Honor.

12         THE COURT:  All right.

13         MR. MALLOY:  Yes, Your Honor.

14         THE COURT:  So Mr. Malloy, what was the problem?

15    I notice this anticipates that Mr. Owen Williams began on

16   some past date.

17         MR. MALLOY:  This Monday.

18         THE COURT:  Well, employment beginning April it

19   looks like April 10th to me, but maybe it's just a --

20         MR. MALLOY:  I believe he was supposed to begin

21   on the 17th, Your Honor.  I don't know if there was some

22   sort of oral modification --

23         THE COURT:  "You will attend new employee

24   orientation on April" it looks like April 17th to the

25   21st.  So that would have been this week he was

lw

1    anticipating to have been in orientation?

2        MR. MALLOY:  That's correct, Your Honor.

3        THE COURT:  What happened?  Why didn't he go to

4    orientation?

5        MR. MALLOY:  Well, briefly just I think it would

6    be helpful if I give you some of the background.

7        THE COURT:  All right, why don't you.

8        MR. MALLOY:  Sir, Mr. Owen Williams graduated

9    from University of Maryland in 1987.  Before that, he had

10   briefly attended Towson.

11       THE COURT:  Well, I've read that.

12       MR. MALLOY:  Okay.

13       THE COURT:  I read that in your --

14       MR. MALLOY:  And I don't want to --

15       THE COURT:  -- temporary restraining order.  I

16   read about his unfortunate instances while at Towson and

17   the dormitory incident and the neighbor and all of that,

18   so I understand that background.  But really it seems to

19   me what's critical here you're alleging, I suppose, a

20   breach of contract.

21       MR. MALLOY:  I am, Your Honor.

22       THE COURT:  And a breach that can only

23   effectively be cured by specific performance.

24       MR. MALLOY:  That's correct, Your Honor.  Mr.

25   Owen Williams has been in the financial services industry

lw

1    for 15 years.  He has a pretty distinguished record.  He's

2    certainly never been fired from a job before.

3            THE COURT:  Well, we're not talking about a

4    firing here, are we?

5            MR. MALLOY:  I would consider it.  I mean he had

6    employment.  There was an employment contract --

7            THE COURT:  Well, let me ask you this.  Let me

8    ask you this.  If he never begins employment and a year

9    from now he's asked have you ever been discharged?  Have

10   you ever been fired from employment?  You believe that

11   these events would require him to answer, yes, I've been

12   fired?

13           MR. MALLOY:  I believe they would.  I mean, you

14   know, when a future employer looks at his records and

15   says, oh, well why did you leave Mass Mutual?  That would

16   certainly --

17           THE COURT:  He never left.  Well, Mass Mutual --

18           MR. MALLOY:  He left because he accepted a job

19   with BB&T.

20           THE COURT:  Yes.

21           MR. MALLOY:  That would certainly give rise to

22   questions regarding the situation.

23           THE COURT:  No.  Well the next question would be

24   well why didn't you work for BB&T?  Well, we had some last

25   minute difficulties, and it didn't come to pass.  I mean I

lw

1    don't know.  I mean in common parlance, it doesn't seem to

2    me that one who is extended an offer and then had the

3    offer withdrawn before he begins employment would be said

4    to have been fired or discharged from the employment.  He

5    just never began.

6         MR. MALLOY:  Respectfully, Your Honor, I

7    disagree.

8         THE COURT:  You think he's fired.

9         MR. MALLOY:  I think he was fired.  There was an

10   offer made.  There was an acceptance.  In reliance on that

11   offer, he quit his previous job.  He wound down his

12   affairs there.  He had a substantial client base there and

13   as part of leaving his prior job, he gave up his clients.

14    He helped them kind of transition off to other financial

15   advisors.  It wouldn't --

16        THE COURT:  Well, there was detrimental reliance

17   on the contract is what you're saying.

18        MR. MALLOY:  Well, also, I think it's helpful to

19   understand his industry.  I mean when you've been doing

20   this for 15 years and then all of a sudden you'd find

21   yourself unemployed and you don't have any clients, you

22   might as well be a college graduate again.

23        THE COURT:  Yes.

24        MR. MALLOY:  I think the harm has been done to

25   him.  This is part of his permanent record now.  This will

lw

1    stay with him forever.

2         THE COURT:  Has he explored the possibility of

3    reinstatement with his previous employer?

4         MR. MALLOY:  I don't know that he has.  I mean

5    this happened last week.  His clients he's helped them

6    transition off to other financial advisors already.  It

7    would be --

8         THE COURT:  So his relationship with what was

9    it, Mass --

10         MR. MALLOY:  Mass Mutual.

11         THE COURT:  Mass Mutual.

12         MR. MALLOY:  He ended on good terms, but he

13    definitely and I'm not sure if it was an agreement maybe

14    not to leave new clients or --

15         THE COURT:  Was he an employee?  What was his

16    association within Mass Mutual?

17         MR. MALLOY:  Same job.  He was a --

18         THE COURT:  Was he salaried?

19         MR. MALLOY:  Go ahead.

20         MR. WILLIAMS:  Your Honor, it was a combination

21    of salary and commission, similar to this.

22         THE COURT:  All right.

23         MR. WILLIAMS:  It's just that at that position,

24    Judge, I was relying on the clients that I had.  The

25    position I was taking with BB&T, I would have been

lw

1    servicing their clients and trying to bring in new

2    clients.  Basically, I, I walked away from a practice that

3    I no longer have because I was gonna manage BB&T's

4    practice of 10 branches in the Washington, D.C. area.

5            THE COURT:  All right.  And so you lost money.

6            MR. WILLIAMS:  Yes, Your Honor, the --

7            THE COURT:  All right.

8            MR. WILLIAMS:  -- present and future value.  I,

9    I mean I'm, I, I would be forced to start over and at my

10   age when this industry hires new people in just out of

11   college, a 42-year-old guy is not somebody, a 42-year-old

12   guy without a client base is not somebody that the, the,

13   the firms want.

14           THE COURT:  Well --

15           MR. MALLOY:  I think --

16           THE COURT:  -- Mr. Malloy has discussed two

17   aspects of harm or damage.  There's mention of loss of

18   clients, loss of money, and all that.  Those losses can be

19   substantial, but they are generally not considered

20   irreparable.  On the other hand, Mr. Malloy also alludes

21   to harm to one's reputation, something that must be

22   explained.  And so it's that latter concept, that latter

23   element that it seems to me to be most important in this

24   hearing.  This isn't a hearing for monetary compensation.

25    This is a hearing alleging irreparable damages, and my

lw

1    question I suppose is this.  If the stigma of having

2    resigned from a job without soon thereafter commencing

3    another job is as significant as is suggested by Mr.

4    Malloy, why would not a possible remedy be for Mr. Owen

5    Williams to simply go back to his former employer and say

6    things haven't worked out with BB&T.  Can I come back?

7    Has that been attempted or asked?

8            MR. MALLOY:  Apparently he's been replaced

9    already.  It has been attempted.  I mean there was a --

10            THE COURT:  Excuse me.  What was your title?

11            MR. WILLIAMS:  Financial advisor, Your Honor.

12            THE COURT:  How many financial advisors does

13   Mass, what is it?  Mass --

14            MR. WILLIAMS:  Mass Mutual.

15            THE COURT:  -- Mutual.

16            MR. WILLIAMS:  Yes, Your Honor.  I --

17            THE COURT:  How many financial advisors do they

18   have?

19            MR. WILLIAMS:  In that office --

20            THE COURT:  In other words, I'm asking you

21   whether the mere hiring of one other person does that

22   preclude them from also hiring you into some position or

23   comparable position?  I don't know.

24            MR. WILLIAMS:  Yes, Your Honor, and due to the

25   fact --

lw

1          THE COURT:  It does.

2          MR. WILLIAMS:  Yes, Your Honor, it does due to

3    the fact that, A, my clients in order to, to maintain the

4    clients, they, they, it is expected that if you leave on

5    good terms, there's a smooth transition because when

6    there's a rocky transition, the client tends to see

7    instability and when it comes to their life savings, they

8    don't want it to be managed by what appears to be an

9    unstable company.  And there, when there's a not-so-smooth

10   transition, the account tends to leave and go to another

11   firm and in order to maintain those clients, they expect

12   and ask for a smooth transition and their accounts are

13   permanently transitioned to another person.

14          THE COURT:  Well, I understand that --

15          MR. WILLIAMS:  And --

16          THE COURT:  -- it may be difficult for you to go

17   back and resume the relationship with the same clients but

18   when you began with Mass Mutual, you didn't bring clients

19   to the employer --

20          MR. WILLIAMS:  Yes, sir.

21          THE COURT:  -- or did you?

22          MR. WILLIAMS:  Yes, sir, I did, Your Honor.

23          THE COURT:  I see.

24          MR. WILLIAMS:  I should also mention --

25          THE COURT:  Excuse me.  How many clients did you

lw

1  -- actually since these are critical issues, whoever

2  intends to perhaps testify be placed under oath now.

3      Thereupon,

4              **ADEL THEO OWEN WILLIAMS**

5  having been called as a witness for and on behalf of the

6  Plaintiff, and having been first duly sworn by the Deputy

7  Clerk, was examined and testified as follows:

8          THE COURT:  State your name again, Mr. Owen

9  Williams.

10         MR. WILLIAMS:  Adel Theo (phonetic sp.) Owen

11  Williams.

12     Thereupon,

13            **THOMAS JAMES ROCCOGRANDI**

14  having been called as a witness for and on behalf of the

15  Defendant, and having been first duly sworn by the Deputy

16  Clerk, was examined and testified as follows:

17         THE COURT:  State your name, sir.

18         MR. ROCCOGRANDI:  Thomas James Roccograndi.

19         THE COURT:  Gentlemen, you're both sworn now;

20  you're under oath.  This isn't a courtroom but for

21  purposes of your testimony, it might as well be because

22  every word we speak is recorded.  These microphones

23  maintained.  It's part of the permanent record of the

24  court.  If a person misrepresents the truth in any

25  material way, he thereby commits a felony offense perjury

lw

1    for which one should expect to be in prison for a number

2    of years if convicted.  I take these hearings and the

3    testimony that's offered in these hearings very seriously.

4     If at the end of a hearing I believe that someone has

5    perjured himself, I order that a transcript be prepared.

6    I send that transcript to the U.S. Attorney's Office for

7    presentation to a Grand Jury.  Do you understand what I've

8    said, Mr. Owen Williams?

9              MR. WILLIAMS:  Yes, Your Honor.

10             THE COURT:  Do you, sir?

11             MR. ROCCOGRANDI:  Yes, sir.

12             THE COURT:  Okay, fine.

13                    **DIRECT EXAMINATION**

14             BY THE COURT:

15        Q    Now with that understanding, Mr. Owen Williams,

16    you say you brought clients to Mass Mutual when you began

17    employment with them, is that correct?

18        A    Yes.  Clients that I had previously served in,

19    in past positions, I made contact with --

20        Q    Excuse me.  How many such clients approximately

21    did you bring with you?

22        A    I'd say four dozen.  About little under 50 but

23    it's hard, it's hard to remember which ones I, I brought

24    in from previous contacts and which ones I, I established

25    while I was there.  But I would say at least four dozen.

15

lw

1    Q    And how many did you leave when you left Mass

2    Mutual?

3    A    Say about 150.

4    Q    When did you notify Mass Mutual of your

5    intentions to leave?

6    A    The, the day I signed and mailed the contract.

7    It was a multi-page contract.  That was the cover page,

8    Judge.  There was, there were several other pages attached

9    to it.

10   Q    Yes.

11   A    But the day I signed and mailed that, I informed

12   them in writing of my, my, my leaving to, and I explained

13   to them where I was going.

14   Q    Do you have a copy of that document

15   (indiscernible)?

16   A    No, Judge, that was, I, I can have my attorney

17   give you a copy of the letter that, that was sent to me.

18   Q    All right.  Well this letter, this exhibit one,

19   is dated March 23rd.

20   A    Yes, sir, or Your Honor.  It was that same day.

21   Q    So on March 23rd, you gave Mass Mutual notice?

22   A    Yes, Your Honor.

23   Q    And that was a written notice by whatever

24   letter?

25   A    By a e-mail.  I, I courtesy copied it to my

lw

1   supervisor and my boss.

2       Q    And in substance, what did you tell them?

3       A    I thanked them for the opportunity to serve

4   them.  I told them that my dream job had, an opportunity

5   to work in my dream job had been presented, and I

6   explained to them that I'd be going to BB&T Bank, the

7   financial service portion, branch of the bank and I,

8   again, I thanked them for the opportunity to serve them

9   and explained what, when my last day would be.

10      Q    When would your last day be?

11      A    The, the Monday which was the, the Monday of the

12  week of over the 14th.

13      Q    Here's a calendar.

14      A    I think that would have been the 9th --

15      Q    There's a calendar right there.

16      A    It would have been the 10th, April 10th.  Well

17  I, I'm sorry, Judge.  I explained I would be turning in my

18  parking pass on the 10th, so my last day would have been

19  the 7th but I explained to them that I would stick around

20  long enough to do the transitions but they be, they

21  immediately began the transition of reassigning the

22  accounts and having me contact the clients and, and inform

23  them that somebody would be in touch with them within

24  hours.

25      Q    All right.  May I see the contract?

lw

1    A    Oh.

2         (Pause.)

3    Q    So is it correct to say that as of March 23rd,

4    you expected to begin orientation on April 17th?

5    A    Yes, Your Honor.  I received the, the contract

6    in an overnight FedEx package, and I had signed it and

7    taken it to the post office and delivered it by registered

8    mail to Mr. Roccograndi.

9    Q    Why did you not begin on the 17th?

10    A    I was contacted and informed that a situation

11    that I had brought to their attention had taken on new

12    life.  Mr. Roccograndi explained to me that compliance had

13    a problem with my record from Towson University, a

14    complaint filed by a campus security guard.

15    Q    This is the trespassing incident?

16    A    Yes, Your Honor.  And I, I explained the details

17    behind the police officer, excuse me, the security guard

18    who was caught in a car theft ring and targeted at me

19    and --

20    Q    Let me ask you this.  When did you first learn

21    that this was of concern to BB&T?

22    A    Mr. Roccograndi contacted me it was believe a

23    Thursday.  With all due respect, Your Honor, this, I've

24    not slept much since that conversation, so days are

25    starting to blend together.  But Mr. Roccograndi contacted

18

lw

1   me I believe it was a, it was a Thursday --

2        Q    Was it before you were to begin the orientation?

3        A    Yes, it was, Your Honor.

4        Q    Well using the calendar, if the orientation was

5   to begin on the 17th and you know it was a Thursday, I

6   suppose that --

7        A    I believe it was a Thursday.  It was either

8   Thursday the 6th or Friday the 7th.

9        Q    Of April?

10       A    Yes, Your Honor.  One of those days he called me

11  and said there was a problem with Towson State University.

12   I explained to him that that was a false accusation.  I

13  explained to him that the situation had been expunged, and

14  I explained to him the history behind the security

15  officer.  I was one of a couple of people that made a

16  video of him taking part in what was in essence a car

17  theft ring on campus.

18       Q    What did Mr. Roccograndi say then?

19       A    He said he was --

20            THE COURT:  Spell your last name for me?

21            MR. ROCCOGRANDI:  It's R-O-C-C-O- --

22            MR. BRIGGS:  And here's a card, Your Honor.

23            THE COURT:  Okay.

24            THE WITNESS:  I, I explained to him -- he, he

25  said he would look into it and if there was a logical

```
 1   explanation, that would be brought.  He also explained

 2   that compliance had a problem with that Towson State

 3   accusation, and I explained to him there shouldn't be a

 4   record to begin with because --

 5           BY THE COURT:

 6       Q    When you say compliance, I don't know what that

 7   means.

 8       A    That is a division of every securities firm that

 9   sort of does the, the vetting --

10       Q    I see.

11       A    -- to make sure that this person is legitimate

12   and doesn't have, there's no legal reason to bar this

13   person from --

14       Q    I see.

15       A    I explained to him.  I faxed him that day a copy

16   of the court order that that accusation be expunged.  I

17   explained to him what the motive was behind filing it in

18   the first place --

19       Q    Yes.

20       A    -- which was a campus police officer who was

21   eventually terminated but because of the unions at the

22   state --

23       Q    Excuse me.  Really that isn't relevant.

24       A    I'm sorry.

25       Q    But what's relevant is when you finished your
```

lw

1    conversation with Mr. Roccograndi, what was your

2    understanding as to their position?

3        A    He was gonna explain the facts, the logical

4    explanation behind the paper trail.

5        Q    And was he going to get back to you?

6        A    Yes, he was.

7        Q    Did you give you a timeframe?

8        A    He said he'll try to get back to me as soon as

9    possible.  We --

10       Q    All right.

11       A    -- we then spoke again early the next week.  I

12   left him a couple of messages but he covers a large

13   territory, so getting back wasn't the easiest thing to do

14   or whenever he got the message.  But the, the next week he

15   got back to me early that week and said they, compliance

16   has a problem with the accusation and I, again, explained

17   vociferously that --

18       Q    Can you using the calendar give me some estimate

19   as to the date?

20       A    He, I believe it was Tuesday.  It was 'cause we

21   didn't speak for several days and he got back to me around

22   Tuesday the 11th.

23       Q    All right.

24       A    And explained to me that compliance had a

25   problem with the Towson accusation and I explained.  I, I

21

l.w

1    told him that I would have somebody from NASD legal office

2    get in touch with him because they're in violation of a

3    court order maintaining records that they were ordered to

4    expunge.

5        Q    Yes.

6        A    And I'd spoke with a lady who's a general

7    counsel of the NASD.  She explained the, the, the mix-up.

8     They had deleted their records of the, of the, of any

9    record because the court order ordered not only the FBI;

10   the state police; the, the county police; and Towson

11   University security to delete but anyone.  They deleted

12   their records but their archives still had a copy of the

13   paper trail.

14       Q    I see.

15       A    And when they checked their records, as with the

16   FBI and the state police, nothing shows up.  But when they

17   checked their archives, they found a copy of the

18   accusation and they presented their archived copy of the

19   accusation to BB&T.

20       Q    I see, all right.  And so what was the next

21   conversation you had or communication with someone from

22   BB&T?

23       A    I had a conversation with Roccograndi.  He said

24   he could not get them to change their mind meaning --

25       Q    Yes.

1      A    -- compliance.  He could not get compliance to

2   change their mind.  They've made up their decision and it

3   was, that was on a Thursday.  And I went to, to my

4   attorney's office that Thursday and explained the

5   situation to them and that was Thursday the, the 13th

6   past, you know, Thursday the 13th.

7      Q    All right.

8      A    Because I had hoped that, that during that week

9   that the logical explanation of the mix-up would have been

10  clarified.

11     Q    Yes.

12     A    But when I realized by Thursday it couldn't be,

13  I thought, and no one would take my calls at either BB&T

14  or NASD was not returning calls.  I figured an attorney

15  might help.

16          THE COURT:  Mr. Malloy, do you have any other

17  questions you want to ask your client to flesh out the

18  record so to speak?

19          MR. MALLOY:  One second.  Yes.

20          BY MR. MALLOY:

21     Q    Mr. Owen Williams, tell me briefly because I

22  think everyone's read it about the incidents with Mrs.

23  Weldon (phonetic sp.).

24     A    Well after NASD finally got on the phone with

25  BB&T and explained their error, their mix-up in presenting

23

lw

1    a copy of an accusation that they weren't legally allowed

2    to maintain records of, BB&T then looked at the situation

3    involving Ms. Marguerite (phonetic sp.) Weldon.

4        Q    Let me stop you right there.  What was the first

5    explanation for wanting to --

6        A    Withdraw.

7        Q    -- withdraw their job offer or breach their

8    employment contract?  What was the first explanation they

9    gave you?

10       A    The, the first and only explanation was the

11   accusation involving the Towson security guard.

12       Q    Let's back up a little bit further than that.

13   The Weldon incidents, did they know about those?

14       A    I made that abundantly clear to Mr. Roccograndi

15   in the first interview in, in Germantown, Maryland.

16       Q    When did the first interview take place again?

17       A    First interview took place late January, early

18   February.

19       Q    So they were aware of that?

20       A    I, I, he asked me very bluntly and honestly to

21   even if I don't think it matters is there anything on my

22   record that would prevent me from getting the job?

23       Q    And this was in late January?

24       A    Late January, early February, our first

25   interview, and I explained to him about my, my what I

24

1    personally believe is a mentally-ill former neighbor and I

2    brought the situation and I made it clear that all charges

3    against me were dropped and that she was facing charges,

4    which for the second week of June --

5        Q    What was your understanding of the charges she

6    was facing?

7        A    Malicious prosecution for filing false

8    statements against me.

9        Q    At all times they were aware.  How many other

10   interviews did you have after the January interview where

11   you disclosed?

12       A    One more with Mr. Roccograndi and one up in

13   Baltimore, up in Frederick with a human resource lady

14   whose name escapes me.

15           MR. ROCCOGRANDI:  Debbie (phonetic sp.) Traverse

16   (phonetic sp.).

17           THE WITNESS:  Ms. Traverse.

18           BY MR. MALLOY:

19       Q    Did you have any other interviews, phone

20   interviews?

21       A    I had phone interviews.  I spoke with Ms.

22   Traverse on the phone for an interview, and then I had

23   spoke with her in person.

24       Q    It sounds like you had about four interviews,

25   some of them in person, some of them phone interviews?

lw

1     A    Yes.

2     Q    And this is all between the period of late

3 January and --

4     A    When the offer was signed.

5     Q    The offer was signed, okay.  Since the offer's

6 been revoked, do you want to get back into --

7     A    I've --

8     Q    -- being a financial advisor again or what are

9 your --

10    A    It's all I've ever done.  This is in my opinion

11 the ideal job.  This is a job that not just myself but a

12 lot of guys have looked for.  I mean it's an ideal

13 company, a perfect location as far as territory.  I mean I

14 --

15    Q    You've changed jobs a couple times all for being

16 a financial advisor.  You've had a couple different

17 positions at different places.  Each time you

18 transitioned, did they ever fail to ask you questions

19 about your job history and your background and the

20 circumstances of why you might have left a job?

21    A    No.  That's part of the initial interview with

22 all of 'em and in this town, especially, I know that they

23 frown on any unexplained reason for leaving because they

24 realize that in a litigious society, no one's gonna

25 bluntly state why they asked you to leave or they sorta

lw

1    rely on not just innuendo but, you know, retrieving

2    innuendo from the circumstances, and they're very

3    reluctant to, to give anyone a job for, that they think

4    lost another job for compliance reasons.  When you

5    interview in this, in, in this industry, and I did it with

6    Mr. Roccograndi, one of the first things you mention as a

7    bragging right if it's true, that is you have an

8    unblemished U4 or U5, meaning you've never had a

9    compliance problem because more than anything in the

10   world, a compliance problem will cost you a job.

11        Q    And do you have an unblemished U4 or U5?

12        A    Absolutely.  I've never had a complaint of any

13   kind and I've gone out of my -- which is why and one of

14   the reasons I don't do derivatives because in my

15   observation throughout the industry, that's the number one

16   cause of compliance problems, derivatives such as options

17   or, or --

18        Q    Let's back up a little bit.  In your experience,

19   has anyone been happy in an interview in these positions,

20   has anyone just been happy with, you know, explanation I

21   just left a place because --

22        A    No.

23        Q    -- it was just wasn't fitting or would they dig

24   deeper than that?  Do they want to know?

25        A    They would dig deeper and it's expected.  You're

lw

1   around hundreds, well, millions of dollars of other

2   people's money.  It would fool hearted to not check

3   someone out but I've been, this situation with the Towson

4   Campus Police, Merrill Lynch looked into this.  Dean

5   Witter looked into this.  They both saw it for what it

6   was, and they accepted the Court's adjudication.  As a --

7          THE COURT:  Let me ask you this.

8          THE WITNESS:  Yes, Judge.

9          THE COURT:  Did you disclose it to those

10  employers?

11         THE WITNESS:  Yes, Your Honor, because I --

12         THE COURT:  Had it been expunged as of that

13  time?

14         THE WITNESS:  I, no, Your Honor.  I, that day I

15  was charged, I went, I was 19 years old.  I went to court

16  by myself.  I didn't know what an expungement was.

17         THE COURT:  Excuse me.  I'm not really asking

18  about that.

19         THE WITNESS:  I'm sorry.

20         THE COURT:  You indicated with Dean Witter and

21  others, these are prior employers you've had?

22         THE WITNESS:  Yes, Your Honor.

23         THE COURT:  And am I correct in understanding

24  that they were aware of the Towson incident?

25         THE WITNESS:  Yes, Your Honor.

lw

1           THE COURT:  How did they become aware of it?

2           THE WITNESS:  They asked me the same question

3  Mr. Roccograndi asked me, and I explained to them that a

4  campus police officer brought a complaint against me and I

5  explained the motive.

6           THE COURT:  But you did not mention it to Mr.

7  Roccograndi?

8           THE WITNESS:  Because a judge told me he had

9  expunged it from my records, which he had and an order had

10  been issued and the judge explained to me that --

11           THE COURT:  So that was my question.

12           THE WITNESS:  Yes, Judge.

13           THE COURT:  The expungement order occurred was

14  issued between your prior employments and your

15  conversation with Mr. Roccograndi?

16           THE WITNESS:  Yes, Your Honor.  It was done in

17  1992.

18           THE COURT:  The expungement.

19           THE WITNESS:  Yes, Your Honor.

20           THE COURT:  And when did you begin with Mass

21  Mutual?

22           THE WITNESS:  I, I was hired in '04, in the fall

23  of '04.

24           THE COURT:  And where were you previously

25  employed?

1    THE WITNESS:  I was with Dean Witter before

2  Morgan Stanley.

3    THE COURT:  What years were you with Dean

4  Witter?

5    THE WITNESS:  I left Dean Witter in '94.

6    THE COURT:  And when had you started with Dean

7  Witter?

8    THE WITNESS:  I started with Dean Witter in '92.

9   It was because Dean Witter suggested I get it --

10    THE COURT:  And when did the expungement order

11  issue --

12    THE WITNESS:  In '92.  In my interview with Dean

13  Witter, they suggested that as innocent as it sounds, just

14  get it expunged.  And it was based on their recommendation

15  that I, I got it expunged, Judge.

16    THE COURT:  Did you disclose it to Mass Mutual?

17    THE WITNESS:  No, Your Honor, I didn't have to

18  because it, legally it wasn't there, and they did a

19  fingerprint background check on me and it didn't or

20  didn't --

21    THE COURT:  So Mass Mutual as of today as far as

22  you know is unaware of the Towson incident?

23    THE WITNESS:  I'm absolutely positive they are.

24   There's no record anywhere except in NASD archives.

25    THE COURT:  I see.  Do you have any other

lw

1   questions?

2           MR. MALLOY:  I have no further questions, Your

3   Honor.

4           THE COURT:  All right.  Mr. Briggs, do you have

5   any questions for Mr. Owen Williams?

6           MR. BRIGGS:  I have a few if I may, Your Honor?

7           THE COURT:  Okay.

8                   **CROSS-EXAMINATION**

9           BY MR. BRIGGS:

10      Q    Just looking at your résumé, it looks like you

11   started at Dean Witter in January of 1993.  Would that be

12   accurate?

13      A    Yes.  It may, yeah.

14      Q    Okay.

15      A    I got the months mixed up but, yes, it was 13

16   years ago.

17      Q    And you left there in June of 1994?

18      A    Yes.

19      Q    And between June of 1994 and it looked like Mass

20   Mutual you started in January of 2005, is that right?

21      A    That's when I began working.  I was hired in the

22   fall of '94.

23      Q    All right, sir.  And between June of 1994 and

24   January of 2005 when you went with Mass Mutual, were you

25   employed in the financial services industry?

lw

1      A    No.   I left the industry because I was in the

2   process of recovering some monies lost.

3      Q    You met with Mr. Roccograndi and you met him

4   through a headhunter, is that correct?

5      A    Yes, sir.

6      Q    He interviewed you and you two got along well,

7   is that right?

8      A    Yes.  He's a --

9      Q    In the early part of 2006, February or so?

10     A    That's why I'm still very interested in working

11  for him.  He's a very amiable person.

12     Q    You said you had disclosed to him that you had

13  an incident involving your neighbor, is that correct?

14     A    Yes, Ms., Mrs. Weldon.

15     Q    And that's Mrs. Weldon?

16     A    Yes.

17     Q    Now he then extended to you an offer of

18  employment, is that correct?

19     A    Yes, he did eventually.

20          MR. MALLOY:  I want to object.  I mean could you

21  if it's --

22          THE COURT:  What is the basis of the objection?

23          MR. MALLOY:  Well if it's testimony that he

24  could give, I would rather hear it from him I think.

25          THE COURT:  Well, you'll have that chance

lw

1    probably, but opposing counsel has a right to cross-

2    examine on whatever --

3        MR. MALLOY:  I understand, Your Honor, but --

4        THE COURT:  All right.

5        BY MR. BRIGGS:

6    Q    And, Mr. Williams, in the letter, the March 23,

7    2006, letter, you were familiar with the first sentence

8    was the offer of employment.  The second sentence says,

9    "All employment offers are contingent upon standard

10   background checks including educational and employment

11   records search, criminal records search, NASD Central

12   Registration Depository report, reference checks, and

13   satisfactory results of our company's pre-employment

14   substance abuse test."  You were familiar that it was

15   contingent upon that, were you not, sir?

16   A    Yes, sir, I was.

17   Q    You also recall that Mr. Roccograndi asked you

18   at this time, the time of the letter, if you would be kind

19   enough to just to send a written explanation of this

20   incident with your neighbor, is that correct?

21   A    Yes, I did.

22   Q    And he told you he had to then have that

23   satisfactory before he explained to the compliance

24   department --

25   A    Yes, sir.

33

lw

1    Q    -- isn't that correct?

2    A    Yes, sir.

3    Q    On March 28, 2006, you then sent a letter to Mr.

4    Roccograndi explaining the situation, did you not, with

5    your neighbor?

6    A    Yes, I did.

7    Q    And may I request this be marked as the next

8    exhibit, Your Honor?  Here's a copy.

9         THE COURT:  These are copies?

10        MR. BRIGGS:  Yes, Your Honor, that's a copy.

11        THE COURT:  And Mr. Malloy has seen it or he has

12   a copy of it?

13        MR. MALLOY:  I believe I have a copy, Your

14   Honor.

15                   (Defendant's Exhibit No. 2 was marked

16                    for identification.)

17        BY MR. BRIGGS:

18   Q    Do you have that exhibit?  Would you take a look

19   at that letter and would you just be kind enough to tell

20   us is that, in fact, the three-page letter you then sent

21   to Mr. Roccograndi explaining the series of incidents

22   involving your neighbor?

23   A    Yes, it is, former neighbor, yes.

24   Q    I see and that was your former neighbor.  And

25   that led to her filing an arrest charge, a warrant.  There

lw

1    was a warrant for your arrest, is that correct?

2         A    Yes.  She --

3         Q    In connection by her --

4         A    -- she falsified a statement that resulted in me

5    being charged.

6         Q    Mm-hmm.  And you were arrested in court, is that

7    correct?

8         A    While I was seeking yet another restraining

9    order against her because one had expired and she had

10   continued to harass me and threaten me, yes.

11        Q    And in this letter, you also explain in the

12   second paragraph a situation involving her in which she

13   had been discussing with you a defraud in money from State

14   Farm Insurance Company, is that correct?

15        A    She requested that I do so, that I assist her --

16        Q    Mm-hmm.

17        A    -- and I refused.

18        Q    It'd be accurate for me to say this isn't

19   something you had previously disclosed to Mr. Roccograndi,

20   was it?

21        A    What?

22        Q    This State Farm fraud situation?

23        A    She made a request and I said, no.  No, I

24   didn't, I, that, that proceeded her harassing me.

25        Q    Okay.

lw

1      A    But she asked me to take part in a fraud and I
2    refused.

3      Q    I understand.

4      A    I reported it to State Farm and I told them to
5    call the state employ, I mean insurance commissioner.

6      Q    Mm-hmm.  But on March 29th, this was after the
7    offer letter, you then felt it was important to disclose
8    that to Mr. Roccograndi, didn't you?

9      A    No.  It was a prepared statement that went into
10   detail.

11     Q    But this was a portion of --

12          MR. MALLOY:  Objection.  What is the relevance
13   of any of this?  He went into greater detail when he was
14   asked to follow up.  I mean he's not guilty of anything.
15   He didn't do anything, you know.  He's not guilty of any
16   of these --

17          THE COURT:  Okay.  The objection's overruled.

18          BY MR. BRIGGS:

19     Q    And would it be accurate for me to say then
20   after you sent this letter to Mr. Roccograndi and after
21   they, BB&T, went through with the background searches that
22   they outlined for you in their letter they were going to
23   do, Mr. Roccograndi got back to you and advised you that
24   BB&T was not going to go forward with an offer to you and
25   rescinded the offer?

lw

1    A    It's a multi-layered question.

2    Q    Was that too long of a question?

3    A    Yes, sir.

4    Q    All right.  Would it be accurate for me to say

5    sometime shortly after your letter to them -- is that

6    March 28th or March 29th, either of the two.  Shortly

7    after your letter, your three-page letter to them

8    explaining the multiple incidents involving this Ms.

9    Weldon, Mr. Roccograndi got back to you and advised you

10   that BB&T was withdrawing their offer to you?

11   A    When Mr. Roccograndi got back in touch with me,

12   he stated it was because of the Towson situation.

13   Q    And he advised you they -- and you understood

14   the Towson situation is something that arose by virtue of

15   the background searches they were doing?

16   A    No.  I understood that the Towson situation

17   arose as a result of the NASD violating a judge's order

18   and disclosing information that was false and had been

19   ordered deleted from their system.

20   Q    I see.  But you understood that the Towson

21   incident in which there were arrests in 1980, was is '87?

22    November of 1987 you were arrested?

23   A    Somewhere around there.

24   Q    And convicted at that time, is that correct?

25   A    Convicted?

lw

1    Q    Of trespassing?  Were you convicted of

2  trespassing?  Would that be accurate for me to say?

3    A    I don't recall.  I recall having to pay a, a $40

4  court costs fine but I don't, Your Honor, I, I --

5         THE COURT:  Well, I'll sustain an objection to

6  that because I think final withdrawals for a conclusion of

7  law on this man's part is to whether he -- it's accurate

8  to say one is convicted of an offense which has been

9  expunged and in terms on the efficacy of an expungement,

10  does it vacate all the prior proceedings?  I don't know

11  but I think you could make a reasonable argument that it

12  does.  Certainly its objective is to convey upon the

13  person whose record is expunged the benefit of vacating

14  the record completely.  So whether he's been convicted or

15  not as of today, I'm not sure what the answer is of that,

16  and so I don't think it's fair to ask him that.

17         MR. BRIGGS:  Thank, Your Honor.

18         BY MR. BRIGGS:

19    Q    But you understood BB&T withdrew its offer,

20  isn't that correct?

21    A    Based on the information they received from the

22  NASD which was given to them falsely, yes.

23    Q    Mr. Roccograndi made it clear to you BB&T was no

24  longer interested in employing you?

25         THE COURT:  On what day are we speaking now?

38

lw

1          MR. BRIGGS:  Within a week of the September 29th

2    letter.

3          THE WITNESS:  No.

4          BY MR. BRIGGS:

5    Q    A week to 10 days.

6    A    No.  Mr. Roccograndi made it clear to me on the,

7    about the 11th of April that he could not, neither he nor

8    his boss.  He said he, he tried speaking to compliance.

9    His boss tried speaking to compliance.  They would not

10   approve me based on the Towson incident.

11   Q    They wouldn't change their position, is that

12   correct?

13   A    Based on the Towson incident.

14   Q    All right.  And he had earlier explained to you

15   that their position was they weren't going to hire you,

16   isn't that correct?

17   A    He, he says, initially he said they were gonna

18   rescind the offer.

19   Q    Mm-hmm.

20   A    And when I explained to him, this was before

21   speaking to me about the Towson incident.  The first I

22   heard that they had record of the Towson incident was

23   around the 6th --

24   Q    Okay.

25   A    -- of April.  And I explained to him the motive

lw

1    behind the filing of the complaint, which was the man was

2    facing termination charges and needed to discredit the

3    person who made a video of him stealing a car, and that

4    was the motive behind the filing of the, the complaint.

5    He said and I told him I had not only my FBI background

6    check which showed that it had been deleted but I also had

7    letters from Towson Police, Towson campus security stating

8    in '95 that they had inadvertently forgot to delete that

9    till 1995.

10        Q    Okay.

11        A    I faxed that to him, which you have, and I also

12   faxed to him a copy of the order.

13        Q    All right, sir.  So on about the 6th of April of

14   2006 is when Mr. Roccograndi had advised you that the

15   offer was going to be rescinded.  You ask him to

16   reconsider that and provided him facts to support why you

17   wanted to be reconsidered.

18        A    And he told me he'd get back in touch with me.

19        Q    Okay.

20        A    And we spoke again on or about some, around the

21   11th.

22        Q    All right, sir.  And on or about the 11th, he

23   told you it would not be reconsidered.  Indeed, BB&T was

24   not interested in hiring you.

25        A    No.  He, those are not his exact words.  His

lw

1    words were compliance is not willing to approve me.

2        Q    Okay, all right.

3        A    And it was for that reason I felt that if an, if

4    an attorney representing me were to get involved and speak

5    to compliance, this situation brought on by the NASD

6    keeping records they were not legally supposed to could be

7    resolved.

8        Q    And your attorney called them and it couldn't be

9    resolved, isn't that fair to say?

10        A    No, sir.  What's fair to say is they, when NASD

11    got involved, their general counsel called BB&T and said

12    we were in error.  You weren't supposed to receive that.

13    They then said, okay, then we're gonna hold the Weldon

14    incident with his neighbor against him.  They switched

15    horses from the Towson incident, which is proven to be

16    completely innocent and resolved, to saying, well, his

17    lawyer, his neighbor albeit criminally at fault, filed a

18    complaint against him.

19        Q    All right, sir.  But at least you understand now

20    that BB&T is not interested in employing you, do you not?

21        A    From you, yes, I've understood that.

22        Q    Did you understand that from Mr. Roccograndi as

23    well?

24            THE COURT:  Well, this is somewhat repetitive

25    because I think the plaintiff has testified that he

lw

1  understood that on April 11th.  That's his testimony, is

2  that correct?

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  That's when he told Mr. Roccograndi

5  says whatever.  It's compliance.  They won't see it.  They

6  won't change.  So I think April 11th is the date that the

7  plaintiff says he definitively understood BB&T was --

8          MR. BRIGGS:  I don't have any further questions,

9  Your Honor.

10          THE COURT:  All right.

11          MR. BRIGGS:  Thank you, sir.

12          THE COURT:  Any redirect?  Anything else that

13  you --

14          MR. MALLOY:  Yeah, I just want to --

15                  **REDIRECT EXAMINATION**

16          BY MR. MALLOY:

17      Q    Mr. Owen Williams, relating to the incidences

18  with Ms. Weldon, were you ever convicted of anything?

19      A    No.  I was --

20          THE COURT:  Well, I think it's clear that on the

21  record as it now stands, there's nothing to suggest that

22  Mr. Owen Williams did anything culpable in connection with

23  that incident and as the record stands, the suggestion is

24  he was a victim of scurrilous accusations by a person who

25  made the accusations either maliciously or perhaps because

lw

1   of some mental illness issues.  But is anyone suggesting

2   that Mr. Owen Williams and I'm asking you, Mr. Briggs --

3           MR. BRIGGS:  Yes, sir.

4           THE COURT:  -- was, in fact, culpable in any way

5   in connection with the events involving what is it, Ms.

6   Weldon?  Is that the lady's --

7           THE WITNESS:  Mrs. Weldon, yes.

8           THE COURT:  Is there any suggestion?

9           MR. BRIGGS:  Yes.

10          THE COURT:  That there is some culpability on

11  his part?

12          MR. BRIGGS:  The culpability perhaps not so much

13  with her as much as the way it was disclosed to Mr.

14  Roccograndi.  There was a disclosure to Mr. Roccograndi

15  prior to the offer being extended, but Mr. Roccograndi

16  then indicated, well, I need to have that in writing just

17  as I indicated and that that would be provided to

18  compliance.  What was --

19          THE COURT:  So your view is that there was an

20  incomplete disclosure?

21          MR. BRIGGS:  Yes, very incomplete and inaccurate

22  that --

23          THE COURT:  Because it didn't mention the

24  insurance fraud aspects, is that the theory?

25          MR. BRIGGS:  Well, it didn't mention that and

lw

1    there were things that were mentioned.  There was an

2    assault that was mentioned in the conversations.  The

3    disclosure here in the letter appeared to bear no real

4    significant relationship to the disclosure that took place

5    to Mr. Roccograndi leaving Mr. --

6          THE COURT:  Well, that I'm not clear on.  In

7    other words, you're suggesting that whatever was initially

8    disclosed to Mr. Roccograndi was insufficient to the

9    extent of being less than candid?

10         MR. BRIGGS:  Yes, Your Honor.  I'm happy to

11    inquire of Mr. Roccograndi if you like.

12         THE COURT:  Well before you do that, is it also

13    your position that what is set forth in this letter is

14    insufficient and less than candid --

15         MR. BRIGGS:  Yes.

16         THE COURT:  -- or is it your position --

17         MR. BRIGGS:  Don't have any basis to know one

18    way or the other.  All we know --

19         THE COURT:  I'm sorry?

20         MR. BRIGGS:  We don't have any basis to know

21    whether this is insufficient or anything other than --

22         THE COURT:  Well, then that means you have no

23    basis to question its sufficiency.

24         MR. BRIGGS:  What our --

25         THE COURT:  In other words, you're not

1   suggesting that the letter of March 28th is significantly

2   deficient in terms of candor, or are you?

3            MR. BRIGGS:  Yes, because we are suggesting it

4   is inconsistent with the prior representation as to

5   describing the relationship and the situation with Ms.

6   Weldon.  So --

7            THE COURT:  Well, what should have been in the

8   March 28th letter and was left out?

9            MR. BRIGGS:  I'm not suggesting anything was

10  left out of the letter.

11           THE COURT:  I see.

12           MR. BRIGGS:  I'm suggesting it was different

13  than, inconsistent with the way the relationship and the

14  incidents were described earlier.

15           THE COURT:  So it's the earlier incident that

16  you view as insufficient?

17           MR. BRIGGS:  No, no.  Pardon, I'm just not

18  stating it well, Your Honor, and perhaps it would be

19  better if I just inquired of Mr. Roccograndi.

20           THE COURT:  Well let me ask you this before you

21  do that.  Is there anything you believe in good faith Mr.

22  Owen Williams should have put in the March 28th letter

23  that he did not?

24           MR. BRIGGS:  Well, the incident that was

25  described earlier as I understand it to Mr. --

lw

1            THE COURT:  No, no, no.  No, before you go into

2    that, I mean I think I'd like a yes or no answer to this

3    question and then if it's yes, I'm going to ask, well what

4    should he have said in the letter that he didn't put in?

5    So but the question is the March 28th letter, is there

6    anything that you believe Mr. Owen Williams should have

7    put in this letter that he did not put in there?  In other

8    words, have you found out anything more about this

9    incident that is significant that you think he should have

10   told you about on March 28th?

11           MR. BRIGGS:  We don't know anything about the

12   incident.  Perhaps the answer to the question is, no.  I'm

13   not saying anything specific --

14           THE COURT:  Well, that's it.  Well that's the

15   answer.

16           MR. BRIGGS:  What I am saying is, however, and

17   it is very significant, Your Honor, and that is what is

18   described in this letter is different than and

19   significantly different than what was earlier described to

20   Mr. Roccograndi.

21           THE COURT:  All right.  Well, I understand that

22   and that arguably reflects back negatively on the prior

23   discussion.

24           MR. BRIGGS:  Yes.  That --

25           THE COURT:  And so I understand your view in

lw

1    that regard, but I'm just trying to clarify you're not

2    alleging that any lack of candor on March 28th.  You're

3    alleging, if I understand you correctly, a lack of candor

4    back in January and February where there was some

5    discussion and maybe other times.  I don't know.  I

6    haven't heard from Mr. Roccograndi yet but as of March

7    28th, you're not saying that you can't point to anything

8    he should have told you as of March 28th that he did not

9    set forth?

10          MR. BRIGGS:  That is accurate, Your Honor.

11          THE COURT:  All right, fine.  Well, why don't

12    you inquire of Mr. Roccograndi.

13          MR. BRIGGS:  Thank you, sir.

14                   **DIRECT EXAMINATION**

15          BY MR. BRIGGS:

16    Q      Could you please state your full name.

17    A      Thomas James Roccograndi.

18    Q      And Mr. Roccograndi, what is your position with

19    BB&T Investments?

20    A      I am a regional sales manager for investment

21    services.

22    Q      As regional sales manager, do you have

23    responsibility for hiring people for sales positions?

24    A      Yes, sir, I do.

25    Q      Could you describe to His Honor when you had

1  first had occasion to have contact with the plaintiff?

2      A    What date or --

3      Q    Approximately.  What was the nature of the

4  contact and why?

5      A    The nature of the contact I was referred to Mr.

6  Adel Owen Williams by MRI, which is the executive

7  headhunter, and so that's how I came in contact with him.

8   As far as the dates, it's somewhere late February.

9      Q    February of 2006?

10     A    Feb. 2006, that's correct.

11     Q    Tell His Honor what happened thereafter.

12     A    I was, I actually did a telephone interview with

13  Adel.  I was very impressed by him.  I decided that I like

14  to go ahead and meet with him.  Adel and I had met.  I'm

15  not exactly sure of the date but we had met in Germantown,

16  Maryland, and Adel and I had spoken for a good period of

17  time.  I was extremely impressed by Adel and his

18  abilities.

19         He, I had asked him if there was anything in his

20  background as far as disclosures or complaints and he said

21  that there was an issue and he said that the issue was

22  that he had a psycho neighbor in his terms and this psycho

23  neighbor just wouldn't go away.  She was a repeated

24  problem for him and his family.  He, he actually mentioned

25  his sister and he said that he had to get numerous

lw

1   restraining orders against him and, and for his sister as
2   well. He inquired or he told me that and, and I asked him
3   well why was this something that would be an issue or why
4   were you convicted or accused of a misdemeanor or a
5   felony? And he said well what had happened was she had
6   approached me and when I, actually he said that she
7   approached me at my home. I, I don't know, a condo,
8   whatever, and he had where he was basically trying to
9   leave and as he was leaving, she wouldn't get out of the
10  way and he innocently pushed her aside or moved her aside
11  and asked her to step aside and when he did that, she, it
12  was over but she had actually accused him of assault and
13  had a restraining order placed against him as well. He
14  said that it was absolutely absurd. He said that it was
15  taken to court and everything was dropped and at that
16  point, I thought really sorry for Mr. Adel Owen Williams.
17   I thought that this was just a horrible situation for
18  him, and I didn't think much of it.
19          And so what I did was I asked him to fill out
20  the form and he was completely honest. He said that, yes,
21  he was charged with this felony or charged or, or that
22  somebody tried to convict him of it, and he said that it
23  was actually dropped. And so what I did was I sent the
24  CRD background check down to Charlotte to our compliance
25  department. Our compliance department saw the conviction

lw

1   on there or the charge of conviction and they wanted

2   further information on it.  So that very next week, I was

3   down in Charlotte myself and --

4           THE COURT:  They saw the charge?

5           THE WITNESS:  They saw that he had checked yes

6   as convicted or charged of a misdemeanor or felony --

7           THE COURT:  Convicted or a charge?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  I see.

10          THE WITNESS:  And so when I went down to

11  Charlotte, I explained that situation and exact story and

12  the compliance officer that I had spoken to felt very

13  sorry for him and said this just seems to be a horrible

14  situation and it's a personal issue.  It really doesn't

15  affect his business, business ethics and so let me run

16  this by Debbie (phonetic sp.) Taylor (phonetic sp.), our

17  chief compliance officer.  Based upon that story, later

18  that day they gave me the thumbs up and said, yeah, we're,

19  you're good to hire him.

20          So when I got back from Charlotte, what I did

21  was I spoke to our employment consultant, who at that

22  point extended the offer to Mr. Owen Williams, and what I

23  did was I completed the offer letter.  I FedEx'ed it to

24  him with a letter in there stating that he needed to send

25  it back to me signed as well as a non-compete agreement,