# EXHIBIT 1 (Part 2)

lw

1   and I received it I believe that Friday.

2           BY MR. BRIGGS:

3       Q    Did you tell him you needed an explanation in

4   writing?

5       A    Oh, yeah, actually it's backed up there.  What I

6   needed to or what was said was that based upon that offer

7   letter, I do need further explanation of what took place

8   and he said that wouldn't be a problem; that he has a

9   document that it was sent to NASD and that he could supply

10  that to me; and that was after the offer letter was

11  received back from him.  When I received that offer

12  letter, I immediately submitted it down to Debbie Taylor.

13  Adel also --

14      Q    When you say the offer letter --

15      A    Or not the offer letter but the response to the

16  offer letter or the response to the compliant.

17      Q    That's the three-page letter?  Is that what

18  you're talking about?

19      A    That's correct, yeah.

20      Q    All right, Exhibit 2.

21      A    That, that's correct.  When I read that, I was

22  blown away because I didn't hear anything about the, the

23  fraud case with State Farm.  I didn't know about the

24  situation with this neighbor of his wanting to have him

25  submit a fraudulent claim to State Farm.  It really just

lw

1    blew me away but at this point, it's not my call any

2    longer.  This is our compliance department's call.

3           So I submitted that down to Debbie Taylor, who

4    is our chief compliance officer.  Adel had also sent that

5    letter to our human resources department.  Human resources

6    looked at it and threw their red flags up and said, whoa,

7    whoa.  This is something that we really need to look at.

8    Based upon Debbie Taylor and the letter and what I had

9    told the compliance officer, they decided to do some

10   additional background checks or dig a little bit deeper

11   just to make sure there wasn't anything out there.  At

12   that point, Debbie Taylor contacted me saying that do you

13   know of the Towson issue?  I said I, I don't know anything

14   about it.  Can you explain it to me?  She explained it to

15   me.  She said based upon the fact that the story that you

16   told our compliance officer and what's in this letter and

17   what happened with the Towson issue, that we are going to

18   rescind this offer.

19          So I contacted Adel and I rescinded the offer.

20   Adel had told me that all that information shoulda been

21   expunged, and he said is there anything that I could do?

22   I said, Adel, at this point I'm gonna have to rescind the

23   offer but I will do everything I can in my power to see if

24   there's anything else that I can do.  I said I'll call you

25   back.

l.w

1      Q    Now as to the first timeframe, plaintiff

2  indicated April 6th was the time of the approximate first

3  call in which you rescinded, is that accurate?

4      A    That, that's correct, and at that point I

5  rescinded that offer.

6      Q    All right, sir.

7           THE COURT:  On what day?

8           THE WITNESS:  April 6th.  I, I believe it was a

9  Thursday of the week before he was supposed to start.  He

10  was supposed to start with me on the 10th.  I was asking

11  him to come in because I wanted to show him around the

12  territory, spend time with him.  That's the reason that it

13  shows the 10th on the offer letter and it's showing the

14  17th down in Charlotte for a new hire.  And so I rescinded

15  the offer on the 6th and I made the telephone calls to

16  numerous folks, Debbie Taylor; my boss, Dennis (phonetic

17  sp.) Blue (phonetic sp.).  He's the national sales

18  manager.  I had spoken to human resources about it, Kathy

19  (phonetic sp.) Kopecki (phonetic sp.), Linda (phonetic

20  sp.) Romero (phonetic sp.).

21           THE COURT:  And how did you communicate the

22  rescission to Mr. Owen Williams --

23           THE WITNESS:  I --

24           THE COURT:  -- on April 6th?

25           THE WITNESS:  -- contacted him on the telephone.

lw

1    And then based upon the information that I shared with

2    them based upon --

3         THE COURT:  And what is the substance of that

4    telephone conversation again?

5         THE WITNESS:  I shared with Mr. Owens or Owen

6    Williams that I was gonna have to rescind the offer based

7    upon the information that's come forth and I didn't --

8         THE COURT:  Which information did you --

9         THE WITNESS:  This is the information that was

10   on the first offer letter or first letter of response to

11   what I'd ask him to write about for his --

12        MR. BRIGGS:  It's Exhibit --

13        THE COURT:  Did you mention anything about the

14   Towson State situation?

15        THE WITNESS:  I, I did.  I did.  I said that

16   this is information that had come up for further digging

17   in his background.  And so what I said to him was that I

18   was gonna have to rescind that offer based upon that

19   information.  And I said to him that at this point 'cause

20   he said is there anything that you can do?  And I said,

21   Adel, at this point my hands are tied and I said this is a

22   decision from Debbie Taylor and Dennis Blue, who are part

23   of our compliance teem.  And I said I will do everything

24   in my power to see if we can get this resolved, and he

25   said that he would appreciate it.  He said he would send

1   me all the information that I need and he did.  He faxed

2   me over a number of different pieces of information about

3   his background.  I forwarded that information on.  He had

4   the NASD contact me as well.  I forwarded that call onto

5   Debbie Taylor, the chief compliance officer.  And so at

6   that point, my hands were tied.  The decision was made by

7   our compliance department to rescind this offer and that

8   was the decision was made based upon that information that

9   had come forth.

10          I, the, the challenge that I faced was that I

11  put my, my credibility on the line because I was told a

12  story and then the letter came back and it was a

13  completely different story from what I was initially told.

14   I really felt sorry for Adel in the beginning, and so I

15  wanted to, to fight for him.  And so that was the story

16  that I had told our compliance department and then when

17  they received this letter, they looked at it as it's

18  different from what the regional manager was told.  It

19  also shows there's potential anger management issues there

20  and so that's where I, that's, that's how this whole thing

21  has, has ended.

22          BY MR. BRIGGS:

23  Q    Does BB&T want to hire the plaintiff?

24  A    At this point, they do not.

25  Q    After your calls to the plaintiff, what, if any,

lw

1    further calls have you received from him?

2        A    Mr. Owen Williams had contact me, had contacted

3    me very, numerous times.  He had left number of different

4    voice mails on my voice mail.  I told him I would call him

5    back but I, I, he continued to push and push and push for

6    a call back and I do apologize but I didn't have any

7    further information.  I was waiting for our compliance

8    department to call me.  I, I didn't have anything else to

9    share with him.  I did have one further conversation with

10   him.  That was last Friday and that conversation was I, I,

11   I told him that at this point my hands are tied.  There

12   was nothing I could do.  And I let Owen vent to me and he

13   said that if there's anything that he could do for me, I

14   would really appreciate it.  I told him that I thought

15   that he was a strong candidate but based upon the stuff in

16   his background, there's nothing I can do.  I thought that

17   he would be a really good investment counselor for us but

18   at this point, there's nothing I can do.  He said that he

19   really wishes that he would have the opportunity to be

20   able to work for such a great team, and the conversation

21   ended at that point.  I told him I'm sorry.  There's just

22   nothing I can do, and he apologized because actually Adel

23   contacted me that this is how this, this whole

24   conversation happened.

25        Adel contacted me to apologize.  He said this is

lw

1   nothing personal.  This is between me and BB&T, and this

2   is the reason that I had to contact an attorney.  So he

3   gave me the heads-up, a courtesy heads-up to let me know

4   that he had contacted counsel.  And so that's it.

5          MR. BRIGGS:  Thank you, sir.  I don't have any

6   further questions.

7          THE COURT:  Mr. Malloy?

8                   **CROSS-EXAMINATION**

9          BY MR. MALLOY:

10     Q    What date did you say that you first met or

11   talked to Mr. Owen Williams?

12     A    I didn't say a date.

13     Q    Can you give a timeframe?

14     A    It was February.  I was, I was contacted by MRI,

15   the headhunter, and they had given me Adel's information

16   and I had contacted Adel and did a telephone interview

17   with him.  And at that point, I decided to meet with him

18   because I thought he would be a good fit for us.

19     Q    What date did you meet with him for the first

20   time?

21     A    Again, I didn't say a date.

22     Q    Just what date did you meet with him?

23     A    I met with him late February or late March.

24     Q    What was your initial --

25     A    Actually it had to be mid-April because the

lw

1    offer letter was done on the 26th, so mid-April.  I do a

2    lot of interviews.

3        Q    So the first time you met with him was in mid-

4    April?

5        A    Mid-February, I'm sorry.  Mid-February.

6        Q    What was your initial impression of him?

7        A    I was very impressed by him.

8        Q    And he disclosed the incident with Ms. Weldon?

9        A    Yes, he did but differently than what's in that

10    letter.

11       Q    Did you ask him is there anything in your

12    background that I might need to know about or did he --

13       A    I did.

14       Q    And then he disclosed the incident?

15       A    He did.

16       Q    Did you meet with him again after that initial

17    meeting?

18       A    I did.

19       Q    What date was that?

20       A    That was a week later.

21       Q    So that would be --

22       A    It, figure the --

23       Q    -- beginning of February still?

24       A    No, no, because the offer letter was done on the

25    26th.  It was probably the week of February 20th.  I and

lw

1    myself and the employment consultant also met with him.

2        Q    Did you guys ask him any other questions about

3    the incident with Ms. Weldon?

4        A    At that point, no, I, I, I didn't.

5        Q    Did you meet with him again --

6        A    I did.

7        Q    -- after that?

8        A    After that point, no, I didn't.

9        Q    A third time?

10       A    No, I didn't.

11       Q    Did you have a phone interview with him?

12       A    Again?  I had a phone interview before we met

13   face to face.

14       Q    But after the second face-to-face meeting with

15   him, would you talk on the phone regularly or --

16       A    I might have spoken to him.  I, I, I don't

17   recall.

18       Q    At some point an offer was made to him?

19       A    Yes, sir, it was.

20       Q    An employment offer?

21       A    It was.

22       Q    What date was that?

23       A    That was done on the 26th.  The offer date,

24   that's February 26th.

25       Q    Did he accept the offer of employment?

lw

```
 1        A     March.

 2              MS. JAMES:  March.

 3              THE WITNESS:  March 26th, March 26th.

 4              MR. BRIGGS:  You might want to look at the

 5   letters that the --

 6              THE WITNESS:  Yeah, I'm trying to recall these

 7   dates.

 8              MR. BRIGGS:  Is this the --

 9              THE WITNESS:  Yeah, this is the --

10              MR. BRIGGS:  -- this issue with the date?

11              THE WITNESS:  Yeah, that's March 23rd.

12              MR. BRIGGS:  Okay.

13              THE WITNESS:  I'm sorry.

14              MR. MALLOY:  If you need to consult something,

15   that's fine.  I'm not trying to trip you up.

16              THE WITNESS:  Yeah.  It's, it's fine.  It's just

17   I got 30 investment counselors.

18              BY MR. MALLOY:

19        Q     All right, so March 30th he received an offer?

20        A     March 23rd.

21        Q     March 23rd.  And did he accept the offer?

22        A     He did.

23        Q     So there was an offer extended to him and he

24   accepted it?

25        A     He did.
```

lw

1    Q    Okay.

2    A    Contingent upon his background check.

3    Q    Okay.

4    A    And I make that clear in every offer.  I, I've

5    hired 18 people in the last 12 months, and I make it very

6    clear that the offer is contingent upon a background

7    check, a successful background check.

8    Q    Then at some point you asked him to draft some

9    sort of follow-up statement?

10    A    I, I did.  I did.

11    Q    What were the circumstances surrounding that?

12    What made you want to do that?

13    A    We needed, well, it wasn't myself.  This is

14    compliance asking for this.  Compliance asked for further

15    explanation because I, I shared this information verbally

16    to our compliance officer.  Our compliance officer said

17    based upon this information, it's a green light, go ahead,

18    but we're gonna need a written statement.

19    Q    So he mails you the written statement or did he

20    hand deliver it?

21    A    He faxed it.

22    Q    Faxed it to you.

23    A    No, it was faxed.

24    Q    And you read it?

25    A    I did.

lw

1    Q    Something in there, you now allege something in

2    there concerned you?

3    A    That letter wasn't for me.  That letter was for

4    our compliance department.  It, it was actually the hiring

5    entity of BB&T Investment Services.  I don't have the

6    ability.  I don't have the final say.  The compliance

7    officer does, and so the compliance officer based upon

8    what I told wanted an explanation in writing and so

9    that's --

10    Q    What you're telling me is you read it but you --

11    A    I what?

12    Q    Nothing concerned you in it or --

13    A    Sure, it jumped out, absolutely.  Sure,

14    absolutely.

15    Q    And at what part of it?

16    A    The information for State Farm.  The information

17    for because the, the story itself was, was so different

18    from the story that I was told.  It didn't say anything

19    about him meeting his neighbor face to face.  It didn't

20    say anything about --

21    Q    So there was --

22         MR. BRIGGS:  Objection, interrupted the

23    witness's answer.

24         THE COURT:  All right.  Let the witness complete

25    his answer.  Didn't say anything about face to face,

62

lw

1    didn't say anything about --

2            THE WITNESS:  It didn't say anything about the

3    information at the very end of, the very end of -- it just

4    sounded as though that it was a situation, a personal

5    situation for Mr. Adel Williams and I felt very sorry for

6    him and it felt as though that he was an innocent

7    bystander put in a situation that it, it could have

8    happened to anybody.  It was a personal thing that didn't

9    affect his business ethic beliefs at all.  So based upon

10   the story, the initial story that was painted for me is

11   the story that I painted for the compliance officer.  When

12   this letter came back and I showed this to the compliance

13   officer, this was a completely different story.  There was

14   so many different pieces of information left out of this

15   letter than the story that I had painted for that

16   compliance officer.

17           THE COURT:  Left out of the letter?

18           THE WITNESS:  Out of the response of this letter

19   here.  This is a letter for --

20           THE COURT:  This is a letter dated what, March

21   28th?

22           THE WITNESS:  March 28th.  This is his response.

23    This is the response to --

24           THE COURT:  Are you saying there were things

25   that were left out of the March 28th letter?

63

Lw

1      THE WITNESS:  No, no, no, no, no.  There's

2  nothing left out of this letter.  What was left out of the

3  conversation or the story that was painted from Adel Owen

4  Williams during our first interview for when he said this

5  is what happened to me.  This is why I have to put yes to

6  pleading or being charged with a misdemeanor or felony.

7  That story was different than what was actually put on

8  paper.

9      BY MR. MALLOY:

10     Q     In what way was it different, though?

11     A     It was different because there's information in

12  here with State Farm where his neighbor presented him with

13  an opportunity to fraudulently fraud State Farm Insurance.

14   There's also information in here that says that's, that

15  it also wanted to fraud the homeowner's association.  It

16  says in here that --

17     MR. MALLOY:  Fraud the homeowner's association?

18     THE WITNESS:  And so this, the story that I had

19  told our compliance department, that story once again I

20  can reiterate, was that he was a victim of a stalker and a

21  stalker was somebody that just wouldn't leave him alone.

22  And I, and I don't want to add words to this because I'm,

23  I'm recalling this as accurately as possible but I believe

24  he said something to the effect that this woman had some

25  sorta feelings towards him and he had nothing to do or

lw

1    didn't want anything to do with her, and so he was

2    basically pushing her away. She wouldn't go away, caused

3    problems for him and his sister. His sister had to get

4    the restraining order. He had to get the restraining

5    order, and he didn't want to have to move. He was just in

6    a situation that this lady wouldn't leave him alone. It

7    didn't have anything to do with fraud. It didn't have

8    anything to do with the other things that happened in the

9    bottom of this page and he said that what had happened

10   was, this woman had seen him at his door, came to his

11   door, and he was on his way out of his apartment or his

12   home and as he was on his way out, she wouldn't let him go

13   by. He had pushed her aside or not pushed her but asked

14   her to step aside. She wouldn't, and he, he actually

15   moved her a little bit and she claimed that he assaulted

16   her. Based upon that then based upon that information

17   that she claims that she filed a assault charge against

18   him. Then she filed a restraining order against him. It

19   was taken to court. When it was taken to court, it showed

20   that all the evidence was, was just bogus information and

21   the courts had dropped that case. And he said that she

22   had not gone away. She completed or continued to do this

23   year after year, and he said this went on for a period of

24   time.

25         Q    So --

lw

1    A    And so that case is the case that I presented to

2  our compliance department and based upon that information,

3  he's just a poor guy that's been beat up by this stalker

4  or this woman that really has some mental issues.

5    Q    And that's after you read the letter?

6    A    No, no.  This is the, this was before the letter

7  was ever given to me.

8    Q    After you read the letter, you saw in there that

9  someone had approached him and asked him to --

10    A    And so the reason --

11    Q    -- assist her in defrauding an insurance company

12  and that --

13    A    That is not the basis for why.  What this did

14  was that this opens the compliance department up doing

15  further background checks.  They dug a little bit deeper,

16  and that's where the Towson thing came up.  He never told

17  me about the Towson thing and so when Debbie Taylor called

18  me and said, hey, we got a different story from what you

19  were told.  We got a different story from what's on this

20  letter from that your initial conversation with Adel plus

21  the Towson incident.  We've got real concerns that just

22  this gentleman is not being forthright with us.  We're

23  concerned that there might be some anger management

24  issues.  We don't want to take the chance of putting him

25  in front of a client that he could potentially hurt

lw

1    himself or someone else so as a company, we've taken the

2    stance that we're just going to rescind this offer.  And

3    so based upon that information, the inaccurate information

4    that was supplied, that's why we rescinded the offer.

5        Q    When did you actually rescind the offer?

6        A    The offer was rescinded on the 6th.

7        Q    You called him up and told him?

8        A    Yeah.  Yes, I did.

9        Q    Back to this letter, is it your position that

10   there are things that he told you in this letter that he

11   didn't tell you about when he first talked to you?

12       A    Yeah.  He didn't say anything about a fraud

13   case.  He didn't say anything about --

14       Q    So let me get this straight --

15            MR. BRIGGS:  Objection, objection.  Interrupting

16   the witness's answer.

17            THE COURT:  Well, I think we've been over this

18   time and again unless there's something new I mean --

19            BY MR. BRIGGS:

20       Q    The only thing I want to flush out is maybe is

21   there anything you asked him to write a three-page follow-

22   up letter detailing it?

23       A    No, I didn't ask him to write a three-page

24   follow-up.  All I asked --

25       Q    Well what did you ask him to do?

lw

1    A    I asked him to give his side of the story.  The

2    statement that he told me, I needed him to put on paper.

3    Q    And he provided you with the statement that

4    contained more details than what he told you originally?

5    A    Yeah.  Well --

6    Q    That's what you wanted him to do, provide with a

7    statement --

8    A    But it --

9    Q    -- in more details --

10    A    -- it, it is different from the story that I was

11    told.

12    Q    In that it contains more information.

13    A    It also has information that is missing.  It,

14    it, the story was that I was told was is that his neighbor

15    had presented or come to him to his front door and he had

16    asked her to step aside.  She didn't step aside --

17    THE COURT:  Excuse me.  Gentlemen, I don't know

18    if you're clear on this but I'm clear.  I understand the

19    respective positions of the parties on the letter.

20    MR. MALLOY:  There's one other area that I

21    wanted to briefly question Mr. Roccograndi on, and then

22    I'll probably be done.

23    THE COURT:  Yes.

24    BY MR. MALLOY:

25    Q    You interview a lot of people.

lw

1    A    I do.

2    Q    Right.  That's part of your job?

3    A    It is.

4    Q    When you interview them, do you ask them about

5    their job history?

6    A    I do.

7    Q    Do you ask them why are you leaving this job to

8    look for another job?

9    A    I, I do.  If it's not stated on their résumé,

10   yeah, or they, they don't come up with it or say it first

11   voluntarily.

12   Q    And, you know, do people ever tell you I was

13   fired or terminated?

14   A    They do.

15   Q    If a job just ends and there's no good

16   explanation --

17   A    Mm-hmm.

18   Q    -- do you dig deeper?

19   A    We do.

20   Q    Do you always make sure that you know exactly

21   why somebody has left a place of employment?

22   A    That's correct, yes.

23   Q    All right.

24   A    It's, it's actually listed on a U4.  A U4 is a

25   security registration with the NASD and it lists all

lw

1    activity.  Whether they're fire, whether it's voluntary

2    termination, it's listed clearly on there.

3        Q    Okay.

4        A    Adel's information will, will never be listed

5    with BB&T because he was never hired and so there,

6    there's --

7        Q    What do you base that information on?  That's

8    just common practice or do you know that?

9        A    Well, one, years of experience but also knowing

10   that you can only, your, your employment is only listed on

11   your U4 if you were actually hired because what we do as a

12   firm is we'll put out there that this is a registered

13   representative that is now employed by BB&T Investment

14   Services.  He had never been employed.

15       Q    Based on your experience then, would his

16   employment with Mass Mutual ending, would that show up on

17   the U4?

18       A    As a voluntary termination, or voluntary, yeah,

19   termination.

20            MR. MALLOY:  I don't have any further questions.

21            THE COURT:  All right.  Gentlemen, let me tell

22   you what my understanding is as to the factual background,

23   and it's pretty clear cut.  I don't discern a lot of or

24   any significant disagreement as to the facts in this

25   matter.  Plaintiff interviews with defendant company,

lw

1  interacts with Mr. Roccograndi beginning in January or

2  February.  It progresses up until March 23rd I think it is

3  when BB&T proffers an offer of employment.

4       Prior to that time, there had been some

5  discussion of this incident involving Ms. Weldon, a

6  neighbor.  In that discussion, Mr. Roccograndi says and

7  I'm inclined to believe that whatever Mr. Owen Williams

8  said to him, Mr. Roccograndi's impression was that this

9  was some sort of unfortunate domestic-type of disagreement

10  between people who were neighbors with possible romantic

11  overtones.  Probably a situation of a woman who has some

12  romantic interest in Mr. Owen Williams and who acts in an

13  unreasonable, arguably demented way as a result of this

14  emotional interest of some sort.  I don't doubt that Mr.

15  Roccograndi as of March 23rd had the impression that the

16  Weldon incident was simply an unfortunate confluence I

17  suppose of people in proximity with each other and

18  eventually this woman making spurious, unfounded

19  allegations with no element, nothing to suggest any

20  intention towards fraud on the part of either party.  He

21  asked for further written confirmation, I suppose, and

22  that's the impression I have, some sort of formal written

23  summary confirming Mr. Owen Williams' representations of

24  this Weldon incident.

25       That written summary is submitted in a timely

lw

1   way by letter of March 28th.  This letter uses terms of

2   insurance fraud.  Now, I don't know what exactly that

3   means.  The impression, the suggestion as I understand the

4   letter is that this woman initially wanted, expected Mr.

5   Owen Williams to confirm that some damage had occurred,

6   which I suppose Mr. Owen Williams felt he could not in

7   good faith do.  He refers to phantom damages.  I don't

8   know what is meant by that but I suppose he means that

9   whatever damages may or may not have occurred, he

10  certainly wasn't in a position to corroborate the woman's

11  allegations.  Whether that is fairly characterized as an

12  invitation to fraud or not, I don't know.  But in any

13  event, I suppose the reference to insurance fraud raised

14  and understandably so red flags that do not apply to the

15  incident as it had been previously described or at least

16  as it had been previously perceived by Mr. Roccograndi.

17  In addition, it appears that further inquiry by BB&T's

18  compliance office unearthed documents pertaining to an old

19  incident of alleged trespassing.

20          I can't say that I see any indicia, at least on

21  what I've heard now, of frankly bad faith on either

22  party's part.  You know, what seems really unfortunate to

23  me, though, is the constricted timeframe of this whole

24  procedure.  A letter is sent on March 23rd anticipating

25  that a new employee begin April 17th.  Well, the problem

lw

1   with that is this as I see it.  The offer on March 23rd is

2   not firm.  It refers to subject to.  I don't know what the

3   exact language was.  I can find it.

4          MR. BRIGGS:  Second sentence in --

5          THE COURT:  Contingent upon stated background

6   checks seems to me a little unfair or unfortunate at least

7   that you send someone a letter indicating he's hired but

8   subject to some supplemental background checks and is

9   expected to begin two, three weeks later because that puts

10  the employee in a position where he has to provide timely

11  notice of his intent to leave his present job before his

12  new job can be confirmed.  It's unfortunate.  Is there any

13  reason why your company couldn't have scheduled this man's

14  commencement on-duty orientation, whatever in late April

15  or May of some sort?  Is there any reason?

16         MR. ROCCOGRANDI:  We could have.  We were, what

17  we require is --

18         THE COURT:  See if that had happened, then the

19  plaintiff would not have felt obliged to provide notice to

20  his employer probably until after all of this vetting, all

21  of this background inquiry had been exhausted and he was

22  certain of the job.  This timeframe just seems to me to

23  invite this sort of situation where he's burned his bridge

24  behind him before he knows whether there's going to be a

25  firm commitment to a job ahead of him, you know.

Lw

1          MR. ROCCOGRANDI:  Your Honor?

2          THE COURT:  That's unfortunate.  That's

3   unfortunate but that's what happened.

4          MR. ROCCOGRANDI:  Your Honor?

5          THE COURT:  Yes.

6          MR. ROCCOGRANDI:  The reason that we have the

7   CRD background check, this is the first background check.

8    We, the reason we have it during the first interview is

9   to give the candidate ample time to have that background

10  check done and completed and a response back to before an

11  offer letter is given.  So the background check started

12  two, three weeks prior to that letter ever being created,

13  the offer letter.

14         THE COURT:  Well when was it completed?

15         MR. ROCCOGRANDI:  The CRD background check?

16         THE COURT:  Did that unearth the Towson --

17         MR. ROCCOGRANDI:  Yes, sir, it did.

18         THE COURT:  I see.

19         MR. ROCCOGRANDI:  It did.

20         MR. MALLOY:  When did you first --

21         THE COURT:  Well, just one minute.

22         MR. ROCCOGRANDI:  The background, this is, do

23  you want to --

24         MR. BRIGGS:  Sure.

25         THE COURT:  You ask for the written explanation

lw

1    of the Weldon incident when?  On March 23rd?

2             MR. ROCCOGRANDI:  I asked, yes, sir.  Actually

3    that point that that offer letter was extended --

4             THE COURT:  Yes.

5             MR. ROCCOGRANDI:  -- it was based upon the offer

6    letter or based that response letter.

7             THE COURT:  Well, perhaps if that request had

8    been made earlier in February or whenever you first became

9    aware, whenever there was any mention of the Weldon

10   incident, perhaps that would have been a better time to

11   have the applicant formalize that in writing.  But this is

12   all with 20/20 hindsight.  Now, Mr. Malloy, what was your

13   question?

14            MR. MALLOY:  I was just going to ask when did

15   your background check first reveal the Towson incident,

16   this 15-year-old incident, the Towson incident when he was

17   an undergrad?

18            MR. ROCCOGRANDI:  It was after the offer letter

19   was done.

20            MR. MALLOY:  It was?

21            MR. ROCCOGRANDI:  Mm-hmm.

22            MR. MALLOY:  Well, I have no further questions,

23   I guess, so --

24            THE COURT:  But in any event, I mean the facts

25   are fairly clear.  I don't think there's any bad faith.

```
 1   You know, this man didn't disclose the Towson incident but
 2   I don't think there's any bad faith in that because
 3   generally when a record is expunged, it's just as with
 4   juvenile adjudications.  The juveniles are led to believe
 5   that the societal interest is that they commence their
 6   adult lives without the stigma of the juvenile
 7   adjudications.  Whether it be for shoplifting or tampering
 8   with a vehicle or even offenses more serious.  They're
 9   told that and I frankly believe that people who have their
10   records expunged, reasonably believe that they can then
11   proceed as if it never existed.  Now if they are
12   specifically asked, well, were you ever convicted and
13   later had the conviction expunged?  That's a little
14   different.  I assume that's not the case here.  I assume
15   that that was not the question.  So I don't see that
16   there's any lack of bad faith on the plaintiff's part in
17   that regard.  Is there such a question?
18            MR. ROCCOGRANDI:  Yes, sir, on the background
19   check.
20            THE COURT:  All right and what does it say?
21   Just tell me.
22            MR. BRIGGS:  The questionnaire indicated "Have
23   you ever been charged, convicted of, pled guilty or nolo
24   contendere to any felony or misdemeanor?"  And the
25   response was yes.  And that was on the 6th of March.
```

lw

1          MR. MALLOY:  But, Your Honor, it doesn't --

2          THE COURT:  Just bear with me for a moment.

3    This is a questionnaire that was presented to the

4    plaintiff?

5          MR. BRIGGS:  Yes, sir.

6          THE COURT:  When was it presented to him?

7          MR. ROCCOGRANDI:  The first interview.

8          THE COURT:  Well, tell me the date.

9          MR. BRIGGS:  The 6th of March.

10         THE COURT:  March 6th.

11         MR. BRIGGS:  Yes, sir.

12         THE COURT:  And he answers yes.

13         MR. BRIGGS:  Yes, sir.

14         THE COURT:  Referring to what?  Does it indicate

15   on there?

16         MR. ROCCOGRANDI:  It, it was in reference to the

17   first incident with his neighbor.

18         MR. MALLOY:  How do you know that?

19         MR. ROCCOGRANDI:  'Cause he told me that.

20         THE COURT:  Well just one moment, just one

21   moment.  Oh, it asks for a charge.  What's the language?

22         MR. BRIGGS:  "Have you ever been charged,

23   convicted of, pled guilty or nolo contendere to any felony

24   or misdemeanor?"

25         THE COURT:  All right.  And he answered yes

lw

1  referring to the Weldon incident?

2        MR. BRIGGS:  Well he doesn't say what he's

3  referring to here but --

4        THE COURT:  Well I'm not sure.  Well, what is

5  the point?  What does that have to do --

6        MR. ROCCOGRANDI:  It, it's an ethical question

7  and so if we see it on the background check come up and

8  they say no to that and there is a misdemeanor, that is a

9  instant disqualification for employment.  And so by

10 answering yes to this, he was answering yes to the

11 incident with his neighbor stating that, yes, I have been

12 charged.  My neighbor charged me.

13       THE COURT:  Right, which --

14       MR. ROCCOGRANDI:  And so he was forthright and

15 disclosed that information.

16       THE COURT:  Exactly, right.

17       MR. ROCCOGRANDI:  But the story that he told me

18 is the story that I --

19       THE COURT:  Well, I understand.  I've gone over.

20       MR. ROCCOGRANDI:  Yeah.

21       THE COURT:  You understood it to be a domestic

22 with no elements of any fraud.  That's --

23       MR. ROCCOGRANDI:  That's correct.

24       THE COURT:  I understand that.  I understand

25 that.  But what I'm saying is that with respect to the

lw

1    Towson incident, I don't think that there is any indicia

2    of bad faith or lack of candor, frankly, on the

3    plaintiff's part.  That's all I'm saying.

4           MR. ROCCOGRANDI:  Yes, sir.

5           THE COURT:  And I said that conclusion might be

6    different if he was asked the question about convictions

7    that were expunged or charges that were expunged.

8           MR. BRIGGS:  Mm-hmm.

9           THE COURT:  But he was not specifically asked

10   that.  Is that correct?

11          MR. BRIGGS:  Yes, that's true.  We're --

12          THE COURT:  All right.  So no bad faith there.

13   You know and I think certainly if he's not hired, he will

14   have some explaining to do about not for being fired.  I

15   don't think, frankly, you know, you can look.  I don't

16   know if we have just a dictionary here, but I just don't

17   think fired.  A person who applies for a job is extended a

18   tentative offer and then the offer's rescinded, Mr.

19   Malloy, I don't think that comes within the concept of

20   fired.  I really don't.  So I don't think he has that to

21   worry about.  He may, though, have to anticipate

22   explaining why he resigned from one job and did not go

23   directly to another job.  Now, I don't know.  Do you

24   routinely ask applicants have you ever been extended an

25   offer of employment and had it rescinded?

lw

1          MR. ROCCOGRANDI:  I don't.

2          THE COURT:  Your company doesn't as far as you

3  know?

4          MR. ROCCOGRANDI:  No, sir.

5          THE COURT:  All right.  So I don't know whether

6  other companies do or not but if they do, that might be an

7  issue that would require some explanation.  Now, that's a

8  factual context that I'm at at this point.  I'll give each

9  of you about five minutes to summarize what your positions

10  are.  If this is a breach of contract and I don't know,

11  frankly, whether it is or not, then this man may suffer

12  some damages.  The pertinent issues here you want me to

13  order that he be hired in the position that was

14  anticipated, is that right?

15          MR. MALLOY:  I do and if you're not --

16          THE COURT:  And how long would he have to stay

17  in that position to avoid damages, injury, irreparable

18  injury?

19          MR. MALLOY:  If he were to be put into his

20  position, it would avoid irreparable injury to him because

21  he wouldn't have this stigma of being fired.

22          THE COURT:  Well --

23          MR. MALLOY:  If somebody asks him in an

24  interview, have you ever had an offer of employment

25  rescinded?  Yes.  Why?

l.w

1          THE COURT:  But excuse me, Mr. Malloy.  He'd

2    have to stay there a reasonable period of time, probably

3    at least a year, wouldn't he?  Otherwise wouldn't he also

4    have to explain, well, why did you start working for them

5    and only stay for three months or six months?  I don't

6    know what is customary.

7          MR. MALLOY:  That presupposes that he wasn't

8    terminated for something in his background check if he

9    were to be offered a --

10          THE COURT:  No.  In other words to avoid the

11    harm that I understand you to be concerned about, he would

12    not only have to be employed and go to work on Monday or

13    whenever you think he should go.  He'd have to stay at

14    that job for a substantial period of time, wouldn't he?

15          MR. MALLOY:  I can't tell you the answer to

16    that.  I think --

17          THE COURT:  Well, I think the answer is clearly

18    yes because I think it might very well be more of a stigma

19    if he went on the job and only stayed there for three

20    months or six months and then left than if he never went

21    to the job to begin with.

22          MR. MALLOY:  Or if he was prevented from going

23    to the job because of something allegedly in his

24    background that caused somebody to --

25          THE COURT:  Unless you have something.  I mean I

lw

1   understand you seem to have a concern about that, but I

2   don't have any basis to conclude that he's going to be

3   injured by someone asking why they withdrew the offer.

4           MR. MALLOY:  It's --

5           THE COURT:  How will they find out about that?

6           MR. MALLOY:  They'll ask him, and he'll have to

7   tell them.

8           THE COURT:  What will they ask him?

9           MR. MALLOY:  Why are you unemployed?  Why did

10  you leave Mass Mutual?  Did you seek employment after

11  that?

12          THE COURT:  Well --

13          MR. MALLOY:  You know, why did you give up your

14  clients?

15          THE COURT:  I think, frankly, unless this man

16  begins work and stays at that job for a substantial period

17  of time to be customary, explainable, which I would think

18  would be at least a year, he's going to arguably have some

19  sort of explanation to tender to someone.

20          MR. MALLOY:  Your Honor, I might add if you're

21  not inclined, you know, I presented you two orders.  If

22  you're not inclined to --

23          THE COURT:  Well what's the difference between

24  the two of them?

25          MR. MALLOY:  One of them is asking and I've

lw

1    approached BB&T about this and for whatever reason they

2    didn't want to do it, asking them to keep his spot open

3    for a little while.  I think I mean this, you know, we're

4    sitting in here --

5         THE COURT:  What will that accomplish?

6         MR. MALLOY:  Well we're sitting in here in an

7    adversary proceeding right now but previously last week,

8    you know, and I know that, you know, counsel has made it

9    abundantly clear to, you know, to Mr. Owen Williams today

10   that they're not interested in hiring him, but I've had

11   conversations with some BB&T employees, you know, over the

12   past week.  I thought maybe if I could get -- the thing is

13   if, you know, the injury to Mr. Owen Williams would be

14   tremendous.  The burden on BB&T for keeping his job open

15   for 10 days, it wouldn't be that burdensome if you want to

16   balance those two against each other.

17        THE COURT:  Well have they hired someone else?

18   Do you know?

19        MR. MALLOY:  I have no idea.  I couldn't get an

20   -- oh, I guess, no.

21        MR. ROCCOGRANDI:  No, sir, I haven't.

22        MR. MALLOY:  You know, just for whatever period

23   you think is reasonable.  I think this man's career, you

24   know, I think the harm that will be done to him is great

25   and I think under these circumstances considering the

lw

1    burden to BB&T --

2            THE COURT:  Well you say hold his position open.

3    I take --

4            MR. MALLOY:  Just for agree -- I'm sorry.

5            THE COURT:  They would take the position he

6    doesn't have a position, but you want them to not hire

7    anyone to fill the position that he was intended to fill?

8            MR. MALLOY:  Yes.  There was a specific position

9    that was offered to him that he accepted.

10           THE COURT:  Is it described in this letter?

11           MR. MALLOY:  I think my client probably --

12           MR. ROCCOGRANDI:  No, sir, it's not.

13           MR. MALLOY:  -- is the representative who could

14   probably describe to you.  Is there --

15           MR. WILLIAMS:  No, he, it was, it was described

16   verbally, Your Honor.  It was, though, 10 branches in the

17   Washington, D.C. I believe you said northwest area.

18           MR. MALLOY:  And I mean there is a position

19   because he said it hasn't been filled yet that would --

20           THE COURT:  Well do you intend to fill the

21   position anytime soon?

22           MR. ROCCOGRANDI:  Yes, sir, I have to fill that

23   position.

24           THE COURT:  By when?  Have you hired anyone yet?

25           MR. ROCCOGRANDI:  Immediately.

lw

1          THE COURT:  Have you extended an offer to

2    anyone?

3          MR. ROCCOGRANDI:  I have not.

4          THE COURT:  So when do you expect to fill it?

5          MR. ROCCOGRANDI:  Within the next month, two

6    months.  It takes that long to go through the process of

7    doing the background checks and the interviewing.

8          THE COURT:  So whether I issue an order or not,

9    they're not going to hire anyone else or at least if I

10   issued a TRO, it's going to last 10 days.  They're not

11   going to hire anyone else within 10 days anyway.

12         MR. MALLOY:  But they could.

13         MR. ROCCOGRANDI:  My next class for a new hire

14   isn't until May, May 17th.

15         MR. MALLOY:  I mean but they could.

16         THE COURT:  Yes, well I suppose anything is

17   possible but with a TRO --

18         MR. MALLOY:  It would --

19         THE COURT:  -- I have to look at what is likely

20   to occur.  And if you're saying that the relief you're

21   seeking is to simply have them not hire someone else in

22   this position for the next 10 days, I have to say, well,

23   how likely is it that your client's going to be

24   irreparably injured within the next 10 days by the company

25   hiring someone else?  And from what I've heard, it doesn't

lw

1    sound very likely at all that that's going to happen.

2              MR. MALLOY:  Your Honor, I mean the job it could

3    be, you know, dissolved, somebody else could be

4    transferred into it.

5              THE COURT:  Well anything is possible.

6              MR. MALLOY:  The potential injury to my client

7    is very great irreparable harm.  I mean he's given up his

8    old job.  He got rid of all his clients in reliance on an

9    offer and an acceptance.  His career it's going to be

10   destroyed and I think asking --

11             THE COURT:  And ultimately --

12             MR. MALLOY:  -- I think it's reasonable just to

13   ask for an order, you know, asking them to not fill the

14   position for 10 days.

15             THE COURT:  All right.

16             MR. MALLOY:  The burden on them I think --

17             THE COURT:  And then at the preliminary hearing,

18   you'll ask what?  That they continue to keep him on the

19   job indefinitely for at least a year, I assume, because I

20   don't see that anything short of that is really going

21   to --

22             MR. MALLOY:  But --

23             THE COURT:  -- prevent the type of injury that

24   you're speaking of.  The injury of having a blip so to

25   speak on your employment record that you're going to have

lw

1    to offer some sort of explanation for.

2              MR. MALLOY:  Your Honor, with all --

3              THE COURT:  And the likelihood of a court

4    issuing a preliminary injunction directing that an

5    employer accept an employee against the will of the

6    employer for a period of a year, I don't think that's

7    likely.

8              MR. MALLOY:  What I'm hoping, Your Honor, is and

9    I've had discussions with some BB&T people, I'm hoping

10   that within if we have some breathing room where they keep

11   the position open for a while, that maybe somebody with a

12   reasonable mind could take an objective look at his

13   situation again.  I don't think that's unreasonable to ask

14   for considering the irreparable harm that he's going to

15   suffer.

16             THE COURT:  Okay.  Well I'm going to pass this

17   for about 10 minutes.  Juan, (phonetic sp.) are you or Ms.

18   Byrd (phonetic sp.) able to stay here late?  Someone --

19             MR. STEVENS:  Yes, Your Honor.

20             THE COURT:  All right.

21             MR. STEVENS:  One of (indiscernible).

22             THE COURT:  We'll recess for 15 minutes.

23             MR. BRIGGS:  Do you want me to address the law

24   at any point, Your Honor?

25             THE COURT:  Probably.

lw

1          MR. BRIGGS:  Okay.

2          (Recess.)

3          MR. MALLOY:  Your Honor, I think my client

4   stepped outside to put money in the meter, and I don't

5   know that they're letting him back in.  I couldn't reach

6   him on the phone.

7          THE COURT:  All right.  So I think we'll have to

8   proceed in his absence.  Now let me say this.  I don't

9   know why that alarm is sounding and if we don't proceed

10  with this now, the alternative is that you can come back

11  tomorrow morning at 10 o'clock and I'll --

12         MR. STEVENS:  Monday morning?

13         THE COURT:  Saturday morning, tomorrow, and I'll

14  try to find either a courtroom or recording equipment to

15  continue it then because I'm not in a position that I

16  would require anyone to stay here if they believe that

17  there's a safety issue.  And, frankly, the only people

18  we're talking about are the lawyers because we're through

19  the testimony and so --

20         MR. BRIGGS:  Yes, Your Honor.

21         THE COURT:  -- the two of you can leave if you

22  want.

23         MR. ROCCOGRANDI:  She's actually a counsel as

24  well.

25         THE COURT:  Well, are you going to be

lw

1    participating in proceedings?

2           MS. JAMES:  Yes, sir.

3           THE COURT:  And what are you going to do because

4    I --

5           MS. JAMES:  In Mr. Briggs's absence, I would

6    protect him.

7           THE COURT:  Well, but I mean now.  Do you want

8    to stay here now?

9           MS. JAMES:  Oh, I'm comfortable.

10          THE COURT:  If anyone's concerned about his or

11   her safety, you can leave.

12          MS. JAMES:  I'm comfortable, Your Honor.  Thank

13   you.

14          THE COURT:  Are you?

15          MR. BRIGGS:  Thank you for asking.  I'm fine,

16   yes, Your Honor.

17          THE COURT:  Mr. Malloy?

18          MR. MALLOY:  I'm okay, Your Honor.  Thank you.

19          THE COURT:  I just don't want to feel that

20   anyone is compelled to stay here if there're uncomfortable

21   means.

22          Well, Mr. Malloy and Mr. Briggs, I'll give you

23   each about five minutes to sum up what your positions are.

24    You want to go first, Mr. Malloy?

25          MR. MALLOY:  Sure, Your Honor.

lw

1   THE COURT: And you know the standards of

2   prerequisites for a temporary restraining order I'm sure.

3                          **CLOSING ARGUMENT**

4        MR. MALLOY: I do, Your Honor. I think, you

5   know, under the circumstances, we've heard some evidence

6   today. Some of it, you know, I think I didn't know that

7   there'd be any dispute as to what happened, but now I

8   think there are some evidentiary disputes. But, you know,

9   I think --

10       THE COURT: What's disputed?

11       MR. MALLOY: Mr. Owen Williams, you know, this

12  bit about someone approaching him and trying to get him to

13  help defraud an insurance company. This is the first time

14  I've and I've talked to some of the other attorneys and

15  representatives from BB&T and this is the first time

16  that's ever been represented as figuring at all into the

17  reason but that's, you know, maybe it was. I don't know.

18   I certainly think that, you know, I guess we've heard

19  plenty of the evidence. We don't need to rehash it.

20       THE COURT: No.

21       MR. MALLOY: I think the reparable harm that Mr.

22  Owen Williams would suffer is tremendous. I mean

23  apparently in his industry, you're only as good as your

24  last reference. He, you know, quit his old place. He got

25  rid of all his clients. He's been doing this for 15

90

lw

1    years.

2            THE COURT:  Well his last reference is Mass

3    Mutual or what is it?

4            MR. MALLOY:  Mass Mutual Insurance.

5            THE COURT:  Mass Mutual, that's his last

6    reference.

7            MR. MALLOY:  But he was offered a job.  He

8    accepted it.  He quit his job at Mass Mutual.  He gave up

9    all his clients.  And then I think it's completely

10   unreasonable that a week before, he's told you don't have

11   a job anymore, you know.  I mean now what does he, you

12   know, he's been doing this for 15 years.  He's as good as

13   somebody walking out of college.  You know, he has no

14   clients.  That's very important in his business.  This is

15   something that's going to stay with him.  When he

16   interviews at the next place, well why did you leave?

17   They're going to ask him about the circumstances of

18   leaving his last job.  They might ask him.  I think it's

19   completely conceivable that someone would ask him have you

20   ever been terminated or had an offer of employment

21   rescinded?  I think that's a common question on a lot of

22   applications.  This will be a part of his history now.  No

23   amount of money can make this go away.  I mean it's a fact

24   and I think when you weigh that against the burden to BB&T

25   in maybe, you know, if you're not inclined to grant the

lw

1   order --

2           THE COURT:  Suppose I grant the order and he's

3   asked that.  How would he answer it?  Have you ever been

4   offered a job and had the offer rescinded?  Suppose I

5   issue the TRO.  How would he then respond to that?

6           MR. MALLOY:  Which TRO or I mean which order?  I

7   was going to suggest --

8           THE COURT:  No matter what I order, if sometime

9   in the future, a year, two, 10 from now he is asked the

10  question you just posed, have you ever been extended an

11  offer of employment and had that offer rescinded, what

12  would his answer be?

13          MR. MALLOY:  And his employment at BB&T is

14  reinstated?

15          THE COURT:  Yes.

16          MR. MALLOY:  I think he could probably

17  truthfully I mean he would truthfully tell them what

18  happened.  You know, they initially rescinded my offer and

19  then --

20          THE COURT:  Well, his answer would be, yes, it

21  was rescinded.  I took them to court.  The judge ordered

22  them to hire me anyway.

23          MR. MALLOY:  Well --

24          THE COURT:  Do you think that's going to make a

25  perspective employer feel that much better about it?

lw

1    MR. MALLOY:  No, but what's his option?  To sit

2    on his hands and let --

3    THE COURT:  I don't think there is any, look,

4    history, events.  What has happened has happened.  I don't

5    think there's any way to undo that.  There've been a

6    series of events in the last several weeks that regardless

7    of what the ultimate outcome is, your client may very well

8    have to explain in the future.  Maybe he won't.  You're

9    anticipating a question about the rescission of an offer.

10    I don't know whether such a question is likely or not and

11    no one knows, frankly, because what might be the practice

12    now may not be the practice a year, two, 10 years from

13    now.  So these are unknowns.  But I just don't think that

14    the type of harm that your client is likely to incur from

15    all this is really going to be effectively prevented by

16    the issuance of a temporary restraining order, either one

17    of these orders, frankly.

18    MR. MALLOY:  I would urge Your Honor to consider

19    also the weight against the burden to BB&T.  I mean in

20    granting the order, you know, having them hold the job

21    open for whatever period of time you think is reasonable,

22    I think the burden to them is miniscule and I think it's

23    considering the effect that this is going to have on my

24    client's career, I think it's entirely reasonable to ask

25    for such a small concession.

.lw

1          THE COURT:  But you see having them hold, if I

2     issue an order directing that they not hire anyone else

3     for the next say month, if I did it for a month, I frankly

4     don't think that that's going to help your client because

5     the reality is and I believe Mr. Roccograndi when he says

6     it, that they're probably not going to hire anyone else

7     within the next 30 days anyway.  And if they want to hire

8     your client if they have a change of heart, they can do

9     it.  There's nothing that would prevent them from doing

10    that with or without an order.  So that aspect of the

11    relief that you want is probably not necessary because the

12    job isn't going to be filled.  They don't have someone

13    coming in on Monday morning to take that job.

14         MR. MALLOY:  Your Honor, I think if Mr.

15    Roccograndi's testimony proved anything, it's that he

16    doesn't have the final say in who gets hired or who

17    doesn't.  I don't think he can say with any definitiveness

18    whether they're going to fill it tomorrow or in a month.

19    I think they could.  They could be filling it as we speak

20    or tomorrow or Monday.

21         THE COURT:  All right.  And we could all not be

22    here on Monday.  No one knows the future definitively for

23    certain.  That's why in connection with these TROs, we

24    talk in terms of probabilities, likelihood; likelihood

25    that someone will prevail; likelihood that someone will

lw

1    suffer irreparable harm.

2            (Pause.)

3            Where we were?  State your name, sir.

4            MR. WILLIAMS:  Adel Theo Owen Williams.

5            THE COURT:  You have any trouble getting back

6    into the courthouse?

7            MR. WILLIAMS:  No, Your Honor.

8            THE COURT:  I see.  Is the alarm sounding down

9    there?

10            MR. WILLIAMS:  Very loudly.

11            THE COURT:  But they let you in anyway?

12            MR. WILLIAMS:  I explained to them that a

13    hearing was going on --

14            THE COURT:  I see.

15            MR. WILLIAMS:  -- and they let me back in the

16    building finally.

17            THE COURT:  So I assume it can't be too serious.

18            MR. WILLIAMS:  I think it's a false alarm but --

19            THE COURT:  Yes.

20            MR. WILLIAMS:  -- for some reason they haven't

21    turned it off.

22            THE COURT:  I see.  All right.  Now, Mr. Malloy.

23            MR. MALLOY:  I guess maybe, you know, just to

24    sum things up, you know, my client's career will be

25    irreparably changed.  He doesn't have any clients anymore.

lw

1    He's been doing this for 15 years.  He gave them away in

2    reliance on a job opportunity.  I mean this is a blemish

3    on his record that's not going to go away.  No amount of

4    money will change it.  I urge you to consider also that

5    the, you know, burden to BB&T is small.  Additionally, I

6    think maybe you might want to give some small

7    consideration to, you know, how expungements were treated.

8    I mean is it reasonable to be able to rely on those

9    anymore or are they meaningless?  Or, you know, Mr. Owen

10   Williams he's never convicted of anything.  He might as

11   well have been convicted, you know, the way that this

12   information was used and treated.  I think that that

13   should probably be given much lesser consideration, but I

14   think it's something that's out there.

15            THE COURT:  Well, that's true.  It's unfortunate

16   and --

17            MR. MALLOY:  Just from a public policy

18   standpoint.

19            THE COURT:  But that cannot in any way be

20   attributable to the defendant, though.

21            MR. MALLOY:  No, it can't but I mean I think

22   it's a factor that's given some weight.

23            THE COURT:  Yes.

24            MR. MALLOY:  Not as much as the other three.

25            THE COURT:  Well --

lw

1          MR. MALLOY:  I think the biggest thing I want

2     you to consider I guess is that the damage to him is going

3     to be great and --

4          THE COURT:  Yes.

5          MR. MALLOY:  -- no amount of money will be able

6     to change it or fix it or make him whole, but the burden

7     on BB&T will not be great.  There might be no burden at

8     all.  So I don't think it would be tremendously harmful to

9     BB&T if you were to grant the order but I think it would

10    be extremely harmful to Mr. Owen Williams if, you know,

11    the status quo isn't maintained and if he's, you know,

12    effectively things are as they stand right now.

13         THE COURT:  Mr. Briggs?

14         MR. BRIGGS:  Thank, Your Honor.  And secondly,

15    thank you for making time for us this afternoon and

16    allowing us the time to fully present it.  We appreciate

17    it.

18         The law in the District of Columbia with the

19    regard to the granting of preliminary injunctions is

20    governed by Rule 65 in the case law.  The case law is

21    clear.  There are four criteria with regard to what must

22    be met in order for a temporary restraining order to be

23    granted:  A substantial likelihood of success on the

24    merits; irreparable injury will result in the absence of

25    the request and relief; no parties will be harmed if

lw

1    temporary relief is granted; and the public interests

2    favored a plea of injunctive relief.

3            The case I have cited from I'll provide to the

4    Court but that this is the Wilkinson (phonetic sp.) case,

5    a 1991 U.S. District Court case in the District of

6    Columbia in which the Court reviewed the law and in which

7    Mr. Wilkinson, a former inspector general of the Legal

8    Services Corporation sought an injunction to prevent the

9    termination of his employment.  In that case, the Court

10   indicated that despite what he claimed as being

11   irreparable harm, the Court there indicated that Mr.

12   Wilkinson's loss of employment would not irreparably harm

13   him.  If it subsequently demonstrated that he was

14   wrongfully terminated, he can then seek full monetary

15   damages and other relief to obtain redress.

16           Now, we believe the facts in this case were

17   fully brought out.  There was an offer.  It was

18   contingent, contingent upon the employment information

19   being fully the background coming out.  The background

20   came out.  At that point, it wasn't satisfactory to BB&T

21   anymore.  They withdrew the offer.  We believe as a matter

22   of law we will prevail on the claim for breach of

23   contract.

24           Therefore, the first issue that there is a

25   substantial likelihood that plaintiff will prevail on the

lw

1    merits, we think is without merit.  To be sure, there's

2    certain equities; the Court pointed them out and we

3    understand those equities.  By the same token when you

4    come down to was there a breach of contract, we believe

5    there was not.

6            Secondly, is it plaintiff endanger of suffering

7    irreparable harm during dependency of the action?  And we

8    do not think that the alleged irreparable harm here is

9    something that one is irreparable or alternatively that

10   injunctive relief as has been requested or that is

11   possible is anything that can do with dressed issues like

12   that.  As the Court so eloquently stated, certain facts

13   have taken place.  Those have occurred and if someone

14   asserts a legal wrong arising out of that, so be it but

15   it's not like an injunction is going to change the

16   situation.  BB&T has stated its position with regard to

17   its desire to employee the plaintiff.  They do not.  As

18   you said, they can change their mind.  The plaintiff can

19   change their mind, change his mind in the future if they

20   want, but that's between the two of them.  This is a

21   personal services contract and they're not enforceable.  I

22   don't know whether the Court has the power to order

23   injunctions.  The Court pretty much has a lot of power and

24   so maybe they could but by the same token, a personal

25   services contract for the most part are not specifically

lw

1    enforceable.  But the irreparable harm issue and the

2    injunctive relief issue here is the type of issue that

3    we --

4            THE COURT:  Well certainly they're not

5    enforceable generally against the employee because you

6    have the issue of involuntary servitude.

7            MR. BRIGGS:  Mm-hmm.

8            THE COURT:  I am not sure that this same applies

9    in the reverse, though.

10            MR. BRIGGS:  Mm-hmm.

11            THE COURT:  I think and I'm pretty confident

12    there are instances where an employer can be required to

13    maintain the employment of an employee.

14            MR. BRIGGS:  Mm-hmm, could be.  By the same

15    token, this is an employment will situation and even a

16    hired could be terminated.  But the situation of that is

17    is there irreparable harm that an injunction can address,

18    we believe that there is neither irreparable harm nor is

19    there appropriate injunctive relief that could be designed

20    to deal with the situation; that it's whatever arises out

21    of the facts, arises.

22            And then the other factors as far as the

23    weighing the balance and balancing the harm to each, the

24    facts are the facts.  We believe there would be

25    detrimental harm to BB&T by --

l.w

1   THE COURT:  Well what harm would there be to

2 BB&T if I simply ordered that the position not be filled?

3   MR. BRIGGS:  I guess it's just the control of

4 the business of BB&T by the court system.  I don't know

5 that there's any specific harm because the reality is that

6 the testimony is they're not intending to fill that

7 position in the next 10 days, 30 days anyway.  They're

8 looking for it.

9   THE COURT:  So there's no comparing the

10 potential harm.  There's none to BB&T by granting that

11 sort of an order.

12   MR. BRIGGS:  And as far as the public interest,

13 again I don't think there's any specific public interest

14 involved here.  There are the interests of the private

15 litigants and those are real and those are serious and

16 those are of concern, but I don't think there's a public

17 interest.

18   Therefore, when the factors are looked at with

19 regard to injunctive relief, we think the situation is the

20 same as connection with the Wilkinson case.  There is a

21 failure of the plaintiff's to meet the necessary

22 evidentiary requirements because this type of situation

23 just does not lend itself to preliminary injunctive

24 relief.  Preliminary injunctive relief should be denied.

25 A temporary restraining order should be denied by the

lw

1   Court here.  Thank you, Your Honor.

2                 **FINDINGS OF THE COURT**

3            THE COURT:  All right.  Well, it's an

4   interesting and unfortunate scenario that we have because

5   I think it's true.  Mr. Owen Williams is the victim in a

6   sense of some unfortunate events.  Initially the

7   administrative failure of some agency to comply with a

8   court order of expungement and, secondly, the timing, the

9   chronology of these different stages in the progression

10  one normally takes from one job to another.  It in this

11  instance was constricted to the point where as I indicated

12  earlier, Mr. Williams was obliged to effectively sever his

13  ties with his present employer before he could be certain

14  of the new employment.  And so there has been this de

15  facto rescission of the offer of employment.  Whether that

16  also amounts to a breach of contract or not is not to be

17  decided here.  I cannot say, frankly, that I am so

18  convinced that there is a breach of contract or that there

19  was a breach of contract that I can say that either party

20  is likely to prevail on the merits ultimately.  There's

21  some I think close factual and legal questions probably

22  that are presented in this case.

23            As to irreparable damage, it may be that some

24  has already occurred.  It may be that more damage will

25  occur but I don't think, frankly, that a temporary

lw

1   restraining order is likely to have any effect on the

2   likelihood of irreparable damages, certainly not in the

3   near term, certainly to the extent that such an order

4   would simply direct that the defendants refrain from

5   filling the underlying position, and my view in that

6   regard is for reasons previously stated.  There's no

7   reason to believe that the position will be filled in any

8   event within the next 10 to 30 days.

9           Frankly, I'm hard put to fault you in any of

10  your way in connection with the background that led to

11  this situation.  I don't think there's a basis under the

12  law for issuing a temporary restraining order, so request

13  is denied.

14          MR. BRIGGS:  Thank, Your Honor.

15          MR. WILLIAMS:  Thanks for your time.

16          MR. MALLOY:  Thank you, Your Honor.

17          THE COURT:  Mr. Briggs, I'm going to ask you to

18  summarize what I have stated in terms of a proposed order.

19          MR. BRIGGS:  Yes, sir.

20          THE COURT:  And I guess I'll have to have you

21  fax that to my Chambers by close of business Monday.

22          MR. BRIGGS:  Yes, sir.  Thank you.

23          THE COURT:  All right, thank you.

24          MR. ROCCOGRANDI:  Thank you.

25          MR. STEVENS:  Parties, please wait outside until

lw

1    I confer with you, please.

2              MR. BRIGGS:  Yes.

3              (Thereupon the hearing was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

√  Digitally signed by Lauren Witkowski,

## ELECTRONIC CERTIFICATE

I, Lauren Witkowski, transcriber, do hereby certify that I have transcribed the proceedings had and the testimony adduced in the case of ADEL OWEN WILLIAMS, vs. BB&T INVESTMENT SERVICES, INC., Case No. CA3084-06 in said Court, on the 21st day of April 2006.

I further certify that the foregoing 104 pages constitute the official transcript of said proceedings as transcribed from audio recording to the best of my ability.

In witness whereof, I have hereto subscribed my name, this 11th day of May 2006.

*Lauren M. Witkowski*

Transcriber