# EXHIBIT 2 (Part 1)

1           SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2                    CIVIL DIVISION

3  - - - - - - - - - - - - - x
                         :

4  ADOL OWEN-WILLIAMS,      :
              Plaintiff, :

5                         :
             versus    :    Civil Action Number

6                         :
  BB&T INVESTMENT SERVICES, :    3084-06

7            Defendant. :
                         :

8  - - - - - - - - - - - - x

9                           Washington, D.C.
                           Monday, May 8, 2006

10

11           The above-entitled action came on for a
hearing before the Honorable ROBERT TIGNOR, Associate Judge,
in Courtroom Number 4220 commencing at approximately 10:05

12  a.m.

13           THIS TRANSCRIPT REPRESENTS THE PRODUCT
           OF AN OFFICIAL REPORTER, ENGAGED BY THE

14           COURT, WHO HAS PERSONALLY CERTIFIED THAT
           IT REPRESENTS TESTIMONY AND PROCEEDINGS

15           OF THE CASE AS RECORDED.

16            APPEARANCES:

17            On behalf of the Plaintiff:

18            SEAN MALLOY, Esquire
            Washington, D.C.

19

20            On behalf of the Defendant:

21            ALAN L. BRIGGS, Esquire
            Washington, D.C.

22

23

24

25  DONNA K. HAWKINS          (202) 879-1035
  Official Court Reporter

COURT REPORTING/DIVISION
DISTRICT OF COLUMBIA
COURTS
2006 MAY -9 P 2: 53
RECEIVED

1

# TABLE OF CONTENTS

2

## WITNESSES

3

On behalf of the Plaintiff:

4

| | Direct | Cross | Redirect |
|---|---|---|---|
| THOMAS J. ROCCOGRANDI | 7 | 26 | |

5

6

^

7

On Behalf Of The Defendant:

8

| | Direct | Cross | Redirect |
|---|---|---|---|
| ADOL OWEN-WILLIAMS | 40 | 51 | 59 |
| BY THE COURT QUESTIONS: | 37 | | |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2            THE DEPUTY CLERK:  You Honor, we have case number
 3  06 CA 3084, Adol Owen-Williams versus BB&T Investment
 4  Services, Incorporated.
 5            THE COURT:  I'm sorry.  What case did you just
 6  call?
 7            THE DEPUTY CLERK:  Owen-Williams versus BB&T.
 8            THE COURT:  All right.  Beginning with Plaintiff's
 9  counsel, I would ask you state your names for the record,
10  please.
11            MR. MALLOY:  My name is Sean Malloy.  I'm counsel
12  for Adol Owens Williams.
13            THE COURT:  Mr. Owen-Williams, state your name,
14  sir.
15            MR. WILLIAMS:  My name Adol Theo Owen-Williams.
16            THE COURT:  Thank you.  And Mr. Briggs.
17            MR. BRIGGS:  Yes, your Honor.  Allen Briggs.  I'm
18  here on behalf of BB&T Investment Services and with me today
19  I have Mr. T.J. Roccograndi who was here previously from
20  Frederick, Maryland and I have Deborah Taylor, who is here
21  from Charlotte, North Carolina.
22            THE COURT:  Now, is Ms. Taylor counsel or is she a
23  potential witness?
24            MR. BRIGGS:  She's a witness.  She's the chief
25  compliance officer.
```

1          THE COURT:  Okay.  Mr. Roccograndi, state your

2     name, please.

3          MR. ROCCOGRANDI:  Thomas James Roccograndi.

4          THE COURT:  And Ms. Taylor, state your name.

5          MS. TAYLOR:  Deborah Taylor.

6          MR. BRIGGS:  She will testify as to--

7          THE COURT:  All right.  Well, before we do that,

8     I'm not sure-- I suppose we will need some testimony, but

9     just for the record, on April the 21st we were last here.

10         The matter came before the Court late in the

11    afternoon on the date that the petition for a temporary

12    restraining order was filed and at the end of the hearing,

13    the Court indicated-- I indicated that I did not think that

14    the predicate for a temporary restraining order had been

15    established.

16         On further consideration over the weekend, it

17    seemed to me appropriate that more of an opportunity should

18    be accorded the parties to present testimony or other

19    evidence and that perhaps a further hearing was appropriate

20    and so I vacated my oral order of April 21st and continued

21    the matter until today for further hearing.

22         Frankly, my concern for these-- one, the matter

23    came up late in the evening.  We had the fire alarm go off

24    and Mr. Owen-Williams was absent from some of the hearing

25    because he had gone to his car to attend to it and then had

4

1    been delayed getting back into the judge in chambers.

2    Furthermore, I had anticipated that a hearing-- at

3    least a status hearing on the request for preliminary

4    injunction would have been scheduled sometime in May.

5    Actually, I understand it was scheduled in July; is

6    that correct?  Is that the date of the next hearing?

7    MR. BRIGGS:  I'm not sure.

8    MR. MALLOY: I'm not sure, your Honor.

9    THE COURT:  In any event, all these factors caused

10   me some concern as to whether indeed there might be the need

11   for a temporary restraining order.  So, I will hear further

12   from both sides today.

13   Now, Mr. Briggs, you have filed supplemental

14   pleadings including allegations, the Defendant's memorandum

15   in opposition and I take it, Mr. Malloy, you have received a

16   copy of this and had an opportunity to review it?

17   MR. MALLOY:  The one Friday night you filed?

18   MR. BRIGGS:  Yes, that's correct.

19   MR. MALLOY:  Yes, I did get a copy of it.

20   THE COURT:  The lady in the back, Ms. Hobson, is my

21   law clerk and I have asked her to review the file and she has

22   prepared for me a summary of events which predicate the

23   request for a temporary restraining order and, frankly, my

24   impression when we were here before was that there really was

25   not substantial issue as to the chronology of events or as to

1    the factual background of the matter, at least in substantial

2    part.

3            One question that I have is this and, Mr. Briggs,

4    you or one of your witnesses could answer that and that is

5    when did BB&T become aware of the Towson incident?

6            MR. BRIGGS:  The date is March 28th.  These folks

7    can tell me if I'm wrong on that.

8            MS. TAYLOR:  That's right.

9            THE COURT:  All right.  March 28th.

10           MR. BRIGGS:  March 28th was the day that Mr.

11   Owen-Williams faxed his three page letter and on that date,

12   the further inquiry-- the CRD to the security data base was

13   undertaken.

14           THE COURT:  And what exactly was the information

15   received as to the Towson incident?

16           MR. BRIGGS:  I'm happy to explain or--

17           THE COURT:  Perhaps testimony would be appropriate

18   in that regard so we have in fact-- we will have all of the

19   potential witnesses placed under oath now.

20           So, I will ask all three of you to raise your

21   hands.

22           (Whereupon, the witnesses were actually sworn at.

23           10:10 a.m.)

24           MR. BRIGGS:  Your Honor, I have prepared a detailed

25   chronology with the exhibits for the Court, if you like.  I'm

                                                          6

1   happy to go through it in its entirety.  I'm happy to focus

2   on any particular issue you would like, but I'm happy to deal

3   with it; introduce it as an exhibit.  I'm happy to do

4   whatever the Court would find most helpful.

5        THE COURT:  I think I prefer to proceed by way of

6   testimony because I suspect much of the material in that

7   chronology is probably not necessary at this stage of the

8   proceedings so specifically and I take it Mr. Malloy has a

9   copy of that?

10       MR. BRIGGS:  Not as yet.  I do not.

11       MR. BRIGGS:  We exchanged documents on Friday

12  night.

13       MR. MALLOY:  I think they were delivered to our

14  office 7 o'clock on Friday.

15       MR. BRIGGS:  But we put this together as a

16  chronology that I can use it for the witnesses.

17       THE COURT:  Well, why don't you just use it,

18  selected from that material.

19       MR. BRIGGS:  All right, sir.  Shall I mark it as an

20  exhibit?

21       THE COURT:  No.  Why don't you just begin with Mr.

22  Roccograndi's testimony?

23                    DIRECT EXAMINATION

24       BY MR. BRIGGS:

25       Q.  Mr. Roccograndi, on or about the second of March of

1    2006, was that the first time you had any reason to become

2    aware of Mr. Owen-Williams?

3        A.    Yes, sir it is.

4        Q.    And tell his Honor how that came about.

5        A.    I was contacted by our headhunting service, our

6    executive search firm, MRI.  MRI sent me an e-mail explaining

7    that she had identified a candidate, Adol Owen-Williams, and

8    what she did was she forwarded his resume to me by e-mail and

9    I reviewed his resume and I contacted her back and I told her

10   I would like to set up a telephone interview.

11       Q.    What did you do next?

12       A.    We set up a telephone interview where I contacted

13   Adol and we spoke briefly on the telephone about his

14   background.

15            It's a time for me to identify if this is a

16   candidate that I would like to be able to have a face to face

17   interview with him and so I spoke briefly on the telephone

18   with him and decided at that time I would like to have a face

19   to face interview.

20       Q.    And did you?

21       A.    We did.

22       Q.    And what date was that?

23       A.    That face to face interview was set up for-- I will

24   refer to this, if that's okay.

25            MR. MALLOY:  Do you have a copy of that for me?

8

1        MR. BRIGGS:  There is a copy.

2        THE WITNESS:  It was Monday, March 6th.

3        BY MR. BRIGGS:

4    Q.    And where did you meet with Mr. Owen-Williams?

5    A.    In Germantown, Maryland.

6    Q.    And for how long did you two meet?

7    A.    We met for about two-two-and-a-half hours.

8    Q.    And at the completion of that interview, did you

9    then have him fill out the questionnaire that is Exhibit Two

10   here?

11   A.    Yes, sir, I did.

12   Q.    And did he sign that?

13   A.    He did.

14   Q.    And generally, tell his Honor what took place at

15   that interview?

16   A.    We discussed his background; we discussed-- it's an

17   opportunity for the candidate to be able to tell me about him

18   or herself and so we spoke about his background; we spoke

19   about what was happening in his current career.

20        There was a lot of different discussions going back

21   and forth and then towards the end of the interview, I

22   decided that I would like to move forward with this candidate

23   and so I asked him to fill out the CRD background check and

24   what he told me was he had to fill yes out to one of the

25   questions because he said that he was involved in a

1    litigation case with his neighbor and he described that

2    situation to me like this.

3            He said that he had a neighbor that had a romantic

4    interest towards him and he said that he didn't want anything

5    to do with this woman.

6            He said that this was a woman that had become a

7    stalker and he said that she had caused all kinds of problems

8    for him, his mother and his sister and he said all he wanted

9    to do was get away from her.

10           He said that he had filed a restraining order

11   against her.  He said that she just was an absolute

12   nightmare.

13           He said that she had come to his apartment or

14   condominium and he said that he was leaving one evening and

15   as he was walking out the door, she was there.  He told her

16   that he was leaving his condo and he asked her to step aside.

17   She wouldn't and he basically moved her aside and then left.

18           He said that he was instructed at that point later

19   on that she filed claims against him for assault and battery.

20   He said it was an absolute absurdity; that that was something

21   he didn't do and she filed a restraining order against him.

22           This went to court and when it went to court, that

23   it was dismissed because he said, in his words, that the

24   information was totally bogus and the judge at that point

25   totally dismissed it.

10

1        He said there just wasn't enough information and so

2   based upon that story I was told, it sounded like he was an

3   innocent bystander.

4        This had nothing to do with his business ethics and

5   so at that point, that's what I was told.

6        Q.   And what's the CRD consent form?

7        A.   That's the pre-registration or the background check

8   form that our Compliance Department performs.  It basically

9   looks at their U-4 U-5 to see if there is any disclosure or

10  client complaint.

11       Q.   And the CRD, does that relate to the record at the

12  National Association of Securities Dealers?

13       A.   Yes, sir, it does.

14       Q.   And is this kind of background required for someone

15  who seeks to sell securities for your firm?

16       A.   Yes, sir, it is.

17       Q.   And you mentioned a Compliance Department.  Does

18  BB&T have a Compliance Department?

19       A.   We do.

20       Q.   And who is the Chief Compliance Officer?

21       A.   Debbie Taylor.

22       Q.   The lady who is here with you today?

23       A.   Yes.

24       Q.   Now, after you filled out the questionable or after

25  Mr. Adol filled it out and signed it, what did you then do

11

1    with this two-page questionnaire?

2        A.   I faxed that down to our Compliance Department in

3    Charlotte, North Carolina.

4        Q.   And do you know what steps they took?

5        A.   They do their background check.  I have to refer to

6    Debbie at that point.

7        Q.   What was your next involvement?  Let me just stop

8    you for just a moment there.  One of the questions on the

9    form also, question number five, was "Have you ever been

10   named in an arbitration or civil litigation case and the box

11   saying no is checked.

12           Let me just ask you if Mr. Owen-Williams disclosed

13   to you that from the period of 1992 after he apparently was

14   fired from Merrill Lynch until just a month ago, were you

15   familiar as to whether or not or had he disclosed to you he

16   had filed many many lawsuits and been a party to many many

17   lawsuits?

18       A.   Absolutely not.

19           MR. MALLOY:  Objection.

20           THE COURT:  Basis of the objection?

21           MR. MALLOY:  The characterization of many many

22   lawsuits.

23           THE COURT:  It's vague. That's your objection?

24           MR. MALLOY:  Yes.

25           MR. BRIGGS:  I'm happy to restate it, your Honor.

                                                              12

1          THE COURT:  All right.  Well, it's also leading.

2   Restate your question.

3          BY MR. BRIGGS:

4     Q.    Did Mr. Owen-Williams, when you met with him on

5   this two-and-a-half hour interview and he filled out this

6   form, did he indicate to you that he was a party to civil

7   litigation in the Court of Maryland?

8     A.    No, sir, he did not.

9     Q.    After you then faxed the form, what was your next

10  step in this process?

11    A.    My next step, I went down to Charlotte, North

12  Carolina for a regional sales manager meeting and while I was

13  down there, I was asked to speak to LaToya English who is a

14  compliance officer of BB&T Investment Services and she asked

15  me, because he marked yes on question number two, she asked

16  me for some more background on why he marked yes and I told

17  her the same story that Adol had told me and she said, based

18  upon that information, that what's she will do is she will

19  run this by our Assistant Compliance Officer, Jeanna Blair

20  and she said that she didn't see there to be any problem with

21  that and so later that day or the very next day Jeanna or

22  LaToya gave me the thumbs up saying that based upon that

23  story, it just doesn't seem as though this is a personal

24  situation and they also felt sorry for him and it just didn't

25  seem to be anything about his business ethics and so-- and so

                                                              13

1    what they would need is a write up on his part, but we could

2    move forward with the hiring.

3         Q.    Ms. English, is she someone that works under Ms.

4    Taylor?

5         A.    She reports up to Debbie.  Debbie is the Chief

6    Compliance Officer.  Debbie Taylor is the Chief Compliance

7    and she reports up-- Jeanna Blair.

8         Q.    After you then had this conversation with Ms.

9    English, what was your next step?

10        A.    I contacted MRI and all correspondence went through

11   MRI?

12        Q.    Is that the headhunter?

13        A.    That is the headhunter service.  And I told them I

14   would like to set up another interview with Adol and this was

15   our third interview.

16        Q.    Can you tell his Honor when that was?

17        A.    That was the very next week on Monday.  I'm sorry.

18   It was Tuesday, March 21st because I got back from Charlotte

19   and that Monday I contacted MRI.

20        Q.    All right.  And tell his Honor what happened?

21        A.    We went into greater detail about the position.  We

22   talked about the commission schedule; we talked about the

23   payouts; we really got into the guts of the position.

24             We talked about the D. C. Market that he would move

25   into; we talked about a number of different things.

1          He brought up at that point his problems with Mass

2    Mutual and the reasons he was leaving Mass Mutual.  He said

3    that Mask Mutual had hired him under the assumption that he

4    would focus his time on investment services and instead of

5    insurance production, he said that that had changed; that

6    they were going into a new direction.  They had adjusted his

7    commission schedule; that there was-- they were asking him to

8    sell more insurance production versus investment production.

9          He said he was an investment counselor and that's

10   the time he wanted to focus with his clients and so

11   everything seemed legitimate.

12        Q.   What was your next step?

13        A.   At that point I asked Debbie Travers who is our

14   employment consultant to also interview Adol because it's

15   always nice to have a second opinion.

16        Q.   Where is she located?

17        A.   She's in Frederick, Maryland.

18        Q.   Is that where your officer is?

19        A.   Yes, sir.  It's in Frederick, Maryland and Debbie

20   Travers interviewed him.  She said that she--

21             MR. MALLOY:  I have to object at this point.  I

22   have been pretty lenient with the hearsay, but some of this

23   is getting out of control.

24             If you could just state what you know, I guess.

25             THE COURT:  Well, I will overrule the objection

1    because much of this is hearsay, but this involves employment

2    contract decisions and so information presented to the entity

3    who make this employment decision, that information is

4    relevant even if it's not true.

5         So, if it's hearsay, it's admitted for the limited

6    purpose of evidence as to what information had been presented

7    to the prospective employer and not necessarily as evidence

8    of the truth of the underlying facts.

9         So, I will overrule the objection.

10        BY MR. BRIGGS:

11        Q.    What did Ms. Travers report back to you?

12        A.    She said that she liked Adol a lot.  She said he

13   was very professional and that he would fit the investment

14   counselor position really well.

15        Q.    What was your next step?

16        A.    I contacted my immediate supervisor, Dennis Blue.

17        Q.    Who is located where?

18        A.    He's in Charlotte, North Carolina.  The process is

19   I have to have compliance approval as well as my supervisor's

20   approval and I told Dennis Adol would be a great fit for us.

21        He asked me some questions about his production;

22   why he was leaving Mass Mutual and I told him exactly what I

23   just said here and he said "Well, based upon what you have

24   told me," he said "You have my blessing."

25        Q.    And what was your next step?

1    A.    I contacted Debbie to let her know I have approval.

2    Q.    When you say Debbie?

3    A.    Debbie Travers, the employment consultant, and I

4  told her I have approval from both compliance and by Dennis

5  Blue, but I was going to need some explanation of what

6  exactly took place on a letter.

7         Adol was to write a letter up and what we did was

8  Debbie contacted Adol and offered him the position and she

9  Fed Ex--

10    Q.    So, that was a phone call?

11    A.    It was a telephone call.  So, Debbie Travers

12  offered Adol the position at that point.

13    Q.    And did you follow up with the letter?

14    A.    I did.

15    Q.    Is that the March 23rd letter, tab 7?

16    A.    Yes, sir, it is.

17    Q.    And does that have attached to it a protective

18  covenant agreement as well?

19    A.    It does.

20    Q.    And is that your signature on that contract?

21    A.    Yes, sir, it is.

22    Q.    On the offer letter and then on the contract as

23  well?

24    A.    Yes, sir, it is.

25    Q.    All right.  And you Federal Expressed those to Mr.

1    Owen-Williams; is that what you said?

2         A.    I did.

3         Q.    And did you have a conversation with him at about

4    the same time with regard to this additional requirement for

5    the written statement?

6         A.    That's right, I did.

7         Q.    And in response to that, did you receive back a

8    letter from Mr. Owen-Williams?

9         A.    I did.

10         Q.    Is that the letter at tab ten?

11         A.    Yes, sir, that is.

12         Q.    Is that the March 28, 2006 letter?

13         A.    Yes, sir.

14         Q.    And could you relate to the Court your reaction

15    after you received that letter?

16         A.    I was disappointed, I was shocked.  It was a

17    totally different story from what I was initially told by

18    Adol and disappointed was the biggest words because I sold a

19    story to our Compliance Department based upon the story that

20    was told to me by Adol.  I put my name on the line and if I

21    knew this information ahead of time, if I was aware of the

22    insurance fraud situation, if I was aware of the Towson

23    issue, I would have second questioned moving forward.

24         Q.    Well, Towson, of course, is not in this?

25         A.    Yes, but with the insurance situation.

1    Q.    And what did you do with this letter?

2    A.    I sent that letter down to Charlotte, North

3  Carolina to Jeanna Blair.

4    Q.    And Jeanna Blair, is she also in Ms. Taylor's

5  Compliance Department?

6    A.    Yes, sir, she is.

7    Q.    And the three people involved in this particular

8  case in the Compliance Department were Ms. Taylor, Jeanna

9  Blair and LaToya English?

10    A.    That's correct.

11    Q.    And what was the next then you heard back from

12  anyone at Compliance with regard to Mr. Owen-Williams?

13    A.    Jeanna Blair contacted me.  She said that she read

14  the letter.

15    Q.    And when did she contact you?

16    A.    The same exact day.

17    Q.    What day was that?

18    A.    That's the 28th.

19    Q.    The 28th of what month?

20    A.    March.

21    Q.    What happened?  What did she say?

22    A.    She called me and said she felt very uncomfortable

23  with this letter.  She said this is not the story that you

24  told us.  She said at that point she was going to refer it to

25  Debbie Taylor because she didn't feel comfortable moving

19

1   forward with this, based upon what was written in that

2   letter.

3       Q.    Okay.   And what was the next thing you heard from

4   the Compliance Department?

5       A.    The next day I received a telephone call from

6   Debbie Taylor and Jeanna Blair and Debbie informed me of the

7   Towson issue.   She asked me if I was aware of it.   I said I

8   was not and that at that point she said that we needed to

9   rescind this offer.

10      Q.    She said who?

11      A.    That would be Debbie Taylor.

12      Q.    Ms. Taylor who is sitting here?

13      A.    That's correct.   She said we need to make sure we

14  have all our I's dotted and T's crossed.   So, we need to work

15  through Human Systems to make sure we do everything the right

16  way.

17      Q.    What is Human Systems?

18      A.    That's our Human Resources Department.   That will

19  be the Human Resources.   That's also our employment

20  consultant.

21      Q.    So, after that call with Ms. Taylor on the 29th of

22  March, describe for his Honor what your next steps were?

23      A.    I sent an e-mail-- well, my next step was I went

24  down to Debbie Travers' office who is an employment

25  consultant and I showed her the letter and she said she had

20

1    already received a letter from Adol.

2           Evidentially, Adol had faxed me a copy and Debbie

3    Travers the same copy.  We spoke about it and then I referred

4    to Lynda Romero.

5           Q.   Who is Lynda Romero?

6           A.   Lynda Romero is an employment consultant who is

7    responsible for pre-hires.  I also contacted--

8           Q.   Was she part of BB&T's investigation service?

9           A.   She's part of BB&T.

10          Q.   And was she in Frederick, Maryland?

11          A.   She is, sir.

12          Q.   A part of the employment group from Frederick,

13   Maryland?

14          A.   She's the manager.  I also contacted Kathy Kopecki

15   who is a Human Resources Generalist who is responsible for

16   Maryland.  She's also actually the generalist for Maryland.

17          So, I contacted both those ladies. I sent them an

18   e-mail saying that I needed to discuss this further with you

19   because-- to rescind this offer.

20          Initially, Lynda Romero threw up a red flag and

21   said "We cannot do this; that we needed to make sure this is

22   the right thing to do;" and at that point she was contacted

23   by Debbie Taylor.

24          Q.   Okay.  And was there a further conversation in

25   which you were a part?

21

1      A.    There was a few conversations just to go over

2   exactly what happened detail by detail.

3      Q.    All right.  And did you talk with Ms. Taylor and

4   various employment people from Frederick, Maryland whom you

5   have identified?

6      A.    I spoke to a number of people just to make sure

7   everything was correct; making sure we were doing the right

8   thing here; and so yes, there were multiple conversations

9   with Lynda Romero, Debbie Taylor, Jeanna Blair and Kathy

10  Kopecki.

11     Q.    In early April, did you have a final conversation

12  in which you received instructions as to going forward?

13     A.    Yes, sir, I did.

14     Q.    Describe for his Honor when that was?

15     A.    We received approval from Lynda Romero who again is

16· our employment consultant manager saying everything has been

17  reviewed and that based upon the information that has been

18  presented, let's rescind the offer.

19     Q.    And what did you do then, sir, to follow up?

20     A.    I contacted Adol Owen-Williams and I told him that

21  the Compliance Department felt as though it was in our best

22  interest to rescind the offer.

23     Q.    And when was this you contacted him?

24     A.    That was on April 6th.

25     Q.    All right, sir.  And what if anything did he

1    indicate at that point in time?

2        A.    He asked me if there was anything that I could do

3    and I told him at this point it's out of my hands; that this

4    was-- that the Compliance Department, our Compliance

5    Department is the ultimate say.

6            They are the ones that decided based upon his

7    background, the letter written, that they felt it was in our

8    best interest to rescind this offer and he said "Is there

9    anything that you can do for me?"  He said "I will go to the

10   NASD and I will contact whoever I need to contact.  I will

11   send you as much information as you need."

12           I told him I would look into it further and that's

13   how we left that conversation.

14       Q.    Okay.  What was the next involvement you had in

15   connection with this, sir?

16       A.    I sent the information that I received because that

17   day Adol had sent me via a fax a large amount of information

18   and I sent that onto Compliance.

19           I gave it to Lynda Romero just to see if there was

20   anything further that we could do.

21       Q.    And what was the conclusion?

22       A.    There was nothing we could do at that point.  In

23   fact, I jumped over a step here.  Adol had the NASD contact

24   me and so I referred NASD to our compliance officer, Debbie

25   Taylor.

1          So, he was making multiple attempts to have people

2     contact us and then my final conversation with Adol was to

3     let him know that this offer has been rescinded and there is

4     absolutely nothing I can do.  It's out of my hand.

5          Q.   And when was that?

6          A.   That was done on Friday.

7          Q.   If you recall.

8          A.   This was Thursday, April 13th.  Friday.

9          Q.   All right, sir.   Now, the position that Mr.

10    Owen-Williams was being hired for, could you identify for the

11    Court what that was?

12         A.   It was an investment counselor for the D.C.

13    metropolitan market.

14         Q.   And could you describe for his Honor what branches

15    BB&T has in the District?

16         A.   We have ten branches in the District and Adol would

17    have been responsible for all ten branches.

18         Q.   Is that position presently vacate?

19         A.   Yes, sir, it is.

20         Q.   And describe for me where Mr. Adol Williams would

21    have been housed?  Where is your office?

22         A.   The office is based out of Farragut Square, on

23    Connecticut Avenue.

24         Q.   And is BB&T presently suffering any damage by

25    virtue of the fact that this position is open?

                                                          24

1      A.    Yes.

2      Q.    Describe for his Honor.

3      A.    I have three investment counselors that are

4   disconnected with this territory.  They're out of the

5   District and they're coming in servicing clients that need to

6   be serviced.

7          We do have a number of clients that have no

8   investment counsel representation right now and so I have

9   investment counselors coming in outside of their territory to

10  cover this, temporarily.

11     Q.    And after his Honor reconsidered his decision, did

12  you-- have you not filled the position?

13     A.    I have not.

14     Q.    Is it your desire to fill the position?

15     A.    Yes, sir, it is.

16     Q.    Do you have any potential candidates available for

17  that position?

18     A.    I do, but since there has been a stay-- another

19  ruling, I haven't been able to continue the hiring process.

20          I interviewed one girl and unfortunately I had to

21  stop interviewing her and the likelihood of her coming on

22  board at that point is poor because there are other offers on

23  the table and so, yes, I will not be able to hire this

24  candidate.

25     Q.    Do you want to hire Mr. Owen-Williams?

25

1    A.    I do not.

2          MR. BRIGGS:  Okay.  I don't have further questions,

3    your Honor.

4          THE COURT:  All right.  Cross examination.

5          MR. MALLOY:  I have a couple of questions.

6                      CROSS EXAMINATION

7          BY MR. MALLOY:

8    Q.    Good morning, Mr. Roccograndi.

9    A.    Good morning.

10   Q.    Did you look at any documents to get ready for this

11   hearing?

12   A.    Yes, sir, I did.

13   Q.    What did you look at?

14   A.    This Superior Court-- the booklet that was prepared

15   by our counsel.

16   Q.    When were you given that?

17   A.    This morning.

18   Q.    What time this morning?

19   A.    Quarter until nine.

20   Q.    And on your direct examination, you have been

21   referring to it?

22   A.    Just the dates.  The dates.

23   Q.    Correct me if I'm wrong.  In your direct

24   examination you said you first became aware of Adol-- I'm not

25   sure if that means-- does that mean you heard about him or

1    first talked to him?

2        A.   No, heard about him.

3        Q.   You said heard about him.  And you said March

4    second?

5        A.   That's correct.

6        Q.   Isn't it true you actually talked to him five weeks

7    earlier?

8        A.   No, there is no way.

9        Q.   Not at the end of January?

10       A.   No, sir, there is not.

11       Q.   At the prior hearing, didn't you tell the judge

12   that you had talked to him at the end of January?

13       A.   I might have missed the months off.  In fact, I

14   think there was some confusion on the number of months.  The

15   dates were correct, but March second is the first time I have

16   heard of Adol Owen-Williams.

17       Q.   Okay.  I'm going to show you--

18           MR. MALLOY:  Your Honor, I'm going to ask that this

19   be marked.  You provide this for us.

20           MR. BRIGGS:  Okay.  It's number one in the tab.

21           BY MR. MALLOY:

22       Q.   What are you looking at?

23       A.   This looks like a resume and this is the cover

24   letter to the resume.

25       Q.   When did you first see this Adol Owen-Williams

1    resume?

2        A.    On March second when MRI e-mailed it over to me.

3        Q.    What's the date on the cover page?

4        A.    February 28th.

5        Q.    And this is a copy of something you in fact saw a

6    month earlier; isn't it true?

7        A.    No, it's not.  This was probably sent to MRI.  Not

8    to me.  MRI is an employment consultant we work through.

9    Everything was corresponded through them.

10        Q.    But at the temporary restraining order, the prior

11    hearing, you did testify that you in fact had talked to him

12    at the end of January?

13        A.    I didn't.

14        Q.    You didn't testify to that or you didn't do it?

15        A.    I'm saying I didn't do it and if I testified, it

16    was a date mistake because I did not speak to him until March

17    second.

18        Q.    When did you actually begin your screening process

19    or your background check for Mr. Owen-Williams?

20        A.    It was done as soon as MRI-- the CRD background

21    check was complete on March 6th.

22        Q.    On March 6th you began your background check?

23        A.    That's correct.

24        Q.    How was the background check-- between March 6th

25    and-- well, let's back up a little bit.  Let's jump  forward.

1    When did you first actually offer Mr. Owen-Williams a job?

2        A.    That was on the 23rd-- actually the job was offered

3    by Debbie Taylor.  I didn't offer him the position or not

4    Debbie Travers.

5        Q.    Isn't it true that you called him on the 21st of

6    March?

7        A.    I called him.

8        Q.    Did you call Mr. Adol Owen-Williams?

9        A.    I don't recall.

10       Q.    Are you saying it didn't happen?

11       A.    I'm not saying that.  I'm saying I don't recall a

12   conversation on the phone.

13       Q.    Do you remember testifying at the last hearing that

14   you called him on March 21st?

15       A.    I have said a couple of times that the dates-- I

16   didn't realize the dates have such a significant bearing as

17   they do and so those dates might have been the 21st, the

18   23rd.  I know the position was offered on the 23rd.

19       Q.    Is it your testimony today that you didn't call him

20   before he actually received the offer in the mail or that you

21   are mixed up on the dates that you called him?

22       A.    No, I'm not saying-- what I'm saying is that the

23   job was offered on the 23rd.  I might have contacted him on

24   the 21st for whatever reason because Adol had called me so

25   many times and so-- but the job was not offered to him on the

29

1    21st.

2         Q.    So, now you did call him on the 21st?

3              MR. BRIGGS:  Objection.

4              THE COURT:  I will sustain the objection.  I think

5    you have exhausted that area.  Let me ask you this, Mr.

6    Malloy.  I don't really understand the relevance of these

7    very subtle differences in the dates.

8              What difference does it make whether it's the 21st

9    or the 23rd?

10             MR. MALLOY:  If I'm allowed a couple of questions,

11   I think it might make more sense.

12             THE COURT:  Well, why don't you ask those questions

13   that will clarify to me how any of this is relevant.

14             THE WITNESS:  It's March 21st.

15             MR. BRIGGS:  There is no question pending.

16             THE WITNESS:  Sorry.

17             BY MR. MALLOY:

18        Q.    Now, between your first meeting with him which I

19   guess you say is March second and your March 21st offer of

20   employment--

21             THE COURT:  Excuse me.  I don't think that's the

22   testimony.  The testimony as I understand it today is that

23   the first interview, the first meeting occurred on March 6th.

24   That the witness first heard of the Plaintiff on March

25   second.

30

1        BY MR. MALLOY:

2        Q.   It's your testimony that the background check began

3    the first day that you met Mr. Adol Owen-Williams?

4        A.   Our face to face interview on March 6th.

5        Q.   How much of the background check occurred between

6    the time you first met him and the time that you offered him

7    employment?

8        A.   Well, we had the CRD done and then-- it was done by

9    our Compliance Department.

10       Q.   The CRD, that's something you submit to the NASD?

11       A.   For every candidate.  Potential candidate.

12       Q.   And you received a response back from them?

13       A.   I received a response back from our Compliance

14   Department.  Our internal Compliance Department.

15            THE COURT:  I take it CRD is an acronym.

16            MS. TAYLOR:  Central Register Depository.

17            BY MR. MALLOY:

18       Q.   Did you receive word back from Compliance before

19   you offered Mr. Adol Owen-Williams the job?

20       A.   I did.

21       Q.   And did tell you the results of the CRD?

22       A.   They said that CRD came back, but because he marked

23   number two, there was nothing that came back on the CRD.  The

24   CRD came back as clean, but because he marked number two on

25   that CRD, we needed further explanation and so that's the

31

1    story I told our Compliance Department.

2         Q.    Just to be sure, the CRD-- I believe it's also in

3    the binder?

4         A.    Yes.  That's the one.

5         Q.    Can you just look at it?

6         A.    Yes, sir, I can.

7         Q.    Take a couple of seconds?

8         A.    I have seen it.

9         Q.    Where do those questions come from?

10        A.    That's something I will have to refer to our Chief

11   Compliance Officer, Debbie Taylor.

12        Q.    Are those questions also found in the U-4 or U-5?

13        A.    Again, that's something I would have to refer to

14   Debbie.

15        Q.    Now, you have also said that you-- after you had

16   offered employment to Mr. Adol Owen-Williams and he had

17   accepted, at a later date you, I'm going to say, fired him

18   just because it appears that there was an employment contract

19   in place.  You said sometime on April 6th; is that correct?

20        A.    Yeah, I didn't fire Adol.  He wasn't employed with

21   us and so for employment to take place, we actually need

22   authorization from the bank and we didn't receive clearance

23   from the bank so there was no employment in place.

24        Q.    You notified him that the job no longer existed for

25   him?

1    A.    The offer that I had made him was being rescinded.

2    Q.    And what date was that that you-- I think you said

3  the 6th?

4    A.    It was the 6th.

5    Q.    Is there any reason-- I mean, would you stop the

6  background check on that date?

7    A.    I would.

8    Q.    The background check stops on the date where you

9  rescind his employment?

10    A.    Well, if we're not going further, that's a question

11  I can't answer because I don't know.  I don't do the

12  background checks.

13    Q.    Isn't it true that you actually-- his employment

14  was actually or he was actually told there was no job for him

15  on April 14th?

16    A.    Because the conversation I initially had with Adol

17  was that Adol told me or asked me if there is anything that

18  he can do further because I rescinded that offer on the 6th

19  and he said to me "Is there anything you can do" and I said

20  to him that I will look into it.  I will talk to our

21  Compliance Department and I will contact Lynda Romero and I

22  will see if there is anything I can do, but at this point my

23  hands are tired;" and then I did exactly what I said I was

24  going to do.  I contacted our Compliance Department again.  I

25  contacted Kathy Kopecky.  I contacted a number of different

1    people, like I said earlier, and the end result was there was

2    nothing we could do based upon the information that had come

3    forward and so I rescinded that offer and it was a done deal

4    at that time.

5            He had faxed me and called me numerous times.

6        Q.    It was a done deal on the 14th?

7        A.    At that time on the 14th, I called him back to say

8    there was nothing I could do.  It was a generosity thing for

9    me to do on the 6th because I could have just walked away and

10   said no.

11       Q.    Did you know that up until the 14th, Mr.

12   Owen-Williams still thought he had a job?

13       A.    No.

14           MR. BRIGGS:  Objection.

15           THE WITNESS: No.

16           THE COURT:  I will permit it.  It's asked and

17   answered.

18           BY MR. MALLOY:

19       Q.    Would it surprise you to know that the background

20   check actually continued until the 14th?

21       A.    No, it wouldn't surprise me.

22       Q.    Why would you continue the background check until

23   the 14th?

24           THE COURT:  I won't support that one.  I don't see

25   that this witness is competent to answer and, secondly, I

1    don't know why it's relevant in any event.

2         MR. MALLOY:  Your Honor, if I may, I think it's

3    relevant to when the job was actually rescinded or taken

4    away, but I understand why.

5         THE COURT:  All right.

6         BY MR. MALLOY:

7    Q.    On the 14th when you contacted Mr. Owen-Williams,

8    what did you tell him was the reason that the job no longer

9    existed for him?

10   A.    I told him that our Compliance Department felt as

11   though this was a candidate that it was in our best interest

12   not to hire and my hands were absolutely tied.

13        I told him three or four different times during

14   that conversation "My hands were tied.  It's out of my

15   control.  It was made by our Compliance Department.  I have

16   no an authority at all to hire him."

17   Q.    When was he supposed to start work?

18   A.    April.  April tenth.  Wait a minute. May tenth

19   because he was going to attend our May class.  Actually, he

20   was going to go attend our April class.  So, April tenth is

21   when he was going to start and the reason that was was

22   because I was going to bring Adol in a week prior to April

23   17th during our new hire orientation because it's a good

24   opportunity for the candidate to come on board; learn his

25   branches; for me to spend time with the candidate to go

                                                              35

1    through our processes so when the candidate goes down to

2    Charlotte, they can ask more informed questions.  They have a

3    better understanding of the position.

4        Q.    During this phone conversation on April 14th, did

5    Adol ask you specifically what were the reasons the job no

6    longer existed for him?

7        A.    I can't recall.

8        Q.    Did you give him specific reasons?

9        A.    I did not.  I told him that Compliance said it

10   can't be done.

11       Q.    Did you tell him the reason was because of the

12   incident at Towson State University when he was an undergrad?

13       A.    At that point, that conversation was a short

14   conversation because I was just rescinding the offer.

15       Q.    At that point, on the 14th, had you given him any

16   reasons why his job no longer existed?

17       A.    I did.  I told him Compliance said I could not hire

18   him.

19       Q.    Did you give him any specific reasons?

20       A.    I did not.

21       Q.    So, on the 14th no one from BB&T ever communicated

22   to him specific reasons?

23       A.    I can't say whether anyone did.  I can say I did

24   not.

25       Q.    Are you aware if he talked to anyone else on the