# EXHIBIT 2 (Part 2)

1    phone besides you?

2         A.    I'm not.

3              MR. MALLOY:  No further questions, your Honor.

4              THE COURT:  All right.

5              Mr. Roccograndi, my initial question was this.

6    When did BB&T first become aware of the incident in Towson,

7    if you know?

8              THE WITNESS:  When I learned of it?

9              THE COURT:  Well, that was going to be my next

10   question.  Do you know when the corporation first received

11   information about the Towson incident?

12             THE WITNESS:  Your Honor, I believe it was the day

13   before I rescinded the offer.

14             THE COURT:  Now, you say you rescinded the offer--

15             THE WITNESS:  Actually, it was March 28th.

16             THE COURT:  Now, you say you rescinded the offer on

17   April 6th; is that correct?

18             THE WITNESS:  Yes, sir it is.

19             THE COURT:  And how was that recision accomplished?

20             THE WITNESS:  In a telephone conversation between

21   me and the candidate.

22             THE COURT:  I see.  When did you personally first

23   become aware of the Towson incident?

24             THE WITNESS:  I personally became aware of it on

25   March 29th.  Debbie Taylor, our Chief Compliance Officer and

1    Jeanna Blair, our Compliance Manager, told me on the

2    telephone.

3            THE COURT:  And do you know when BB&T first became

4    aware of the Towson incident?

5            THE WITNESS:  On March 28th.  Tuesday, March 28th.

6            THE COURT:  Now, am I correct in understanding that

7    the corporation has stopped the hiring process to fill this

8    position?

9            THE WITNESS:  Yes, sir.  We were instructed to do

10   so.  I was instructed to do so by our internal counsel.

11           THE COURT:  Well, I would suggest that perhaps your

12   counsel-- do you have some understanding as to why that was

13   felt necessary?

14           THE WITNESS:  No, sir, I don't.

15           THE COURT:  I mean, does it have anything to do

16   with the court order of April 23rd?

17           THE WITNESS:  I would refer to counsel.

18           THE COURT:  The reason I ask is this.  I understood

19   your testimony on April the 21st to be that-- I believe you

20   said it would take at least a month and perhaps two months

21   before you could fill that position in any event.

22           Am I incorrect in that regard?

23           THE WITNESS:  No, sir, your Honor, that's accurate.

24   It takes two or three interviews.  It takes bank clearance.

25   There are a number of different things that have to take

1    place before we can extend an offer.

2    　　　　　THE COURT:  Now, is it your testimony that the

3    pending court order has in any way affected your

4    corporation's efforts to fill this position.

5    　　　　　THE WITNESS:  Yes, sir.

6    　　　　　THE COURT:  How so?

7    　　　　　THE WITNESS:  I believe, based upon your ruling and

8    then your decision to hear this case once again, as a firm we

9    decided to just put a stay on that position and to not do any

10   interviewing in this process for that specific position.

11   　　　　　THE COURT:  I see.  All right.  Thank you. I would

12   like to hear from the Plaintiff now as to what has been

13   attested to is really at issue.

14   　　　　　I would be interested in knowing why BB&T has, if I

15   understand Mr. Roccograndi correctly, terminated-- stopped

16   any effort to fill the position because certainly that was--

17   was that your recommendation?

18   　　　　　MR. BRIGGS:  We don't mean anything negative, but

19   when I saw your order, at that point in time we just sort

20   of-- we don't want to do anything to upset the Court.

21   　　　　　THE COURT:  I appreciate that, but the order says

22   that the Defendant shall refrain from filling the position at

23   issue.

24   　　　　　I think it's a fairly broad interpretation to say

25   that the order prohibits efforts to find a candidate.

1    MR. BRIGGS:  We're not arguing that.  We want to be

2    conservative.  We don't want to do anything the Court was

3    going to look askance at, your Honor.

4    THE COURT:  All right.  Mr. Malloy, what are the

5    factual issues?  What are the areas disagreement is about?

6    You can either address it by way of a brief opening

7    statement or you can simply elicit testimony from Mr.

8    Owen-Williams.

9    MR. MALLOY:  I believe a brief opening statement

10   might make it easier for me.

11   If would like me to elicit the testimony from Mr.

12   Owen-Williams, I can do that as well.

13   THE COURT:  Whichever you prefer.

14   MR. BRIGGS:  I would hope at the end of his opening

15   statement I would be given the equal opportunity to make an

16   opening statement at the same time.

17   MR. MALLOY:  Well, I can elicit it through Mr.

18   Owen-Williams.  That might be the easiest thing to do to keep

19   everything fair and equal.

20   THE COURT:  All right.  Why don't we do that.

21   DIRECT EXAMINATION

22   MR. MALLOY:

23   Q.  Mr. Owen-Williams, when did you first hear about

24   the job at BB&T?

25   A.  It was toward the end of January of this year.  At

1  the beginning of January I had placed my resume on Career

2  Builders stating the position I was looking for; what my

3  dream position was, but what other positions I would be

4  willing to consider.

5          THE COURT:  Now, Mr. Owen-Williams, just for

6  clarity of the record, restate your name, please.

7          THE WITNESS:  My name is Adol Theo Owen-Williams.

8          THE COURT:  All right. Thank you.  Now you may

9  proceed, Mr. Malloy.

10         BY MR. MALLOY:

11     Q.    When were you first contacted by BB&T?

12     A.    I was initially contacted by the search company. A

13  young lady whose name escapes me right now-- and she hadn't

14  mentioned the name the first time we had spoke.  She just

15  mentioned the job description and wanted to know if I was

16  interested and I explained to her it was a position that,

17  like a lot of people in my position, I had always dreamed of

18  and I would be very interested to find out who the company

19  was.

20         She said she wanted to contact the company to see

21  if there would be mutual interest in exchanging names.

22     Q.    What date was this about?

23     A.    This was about the last week of January of 2006.

24     Q.    When did you first talk to Mr. Roccograndi?

25     A.    I recall speaking to him initially within a few

1    days.   It would have been the last Thursday or Friday of

2    January.

3        Q.    How many telephone calls did you have before you

4    had a face to face conversation?

5        A.    Three.   The third conversation was just to set up a

6    date to meet in Germantown; but when we spoke, we had

7    detailed conversations about my work history and as with all

8    prospective employers in our industry, we had a conversation

9    about any compliance problems I might have and I informed him

10   I never had any litigation brought on about my work.

11       Q.    When did you actually first meet Mr. Roccograndi

12   face to face?

13       A.    We meet the beginning of March at the Germantown

14   branch of BB&T on Germantown Road.

15       Q.    The beginning of March?

16       A.    The beginning of March.

17       Q.    Had you provided any documents to him before your

18   face to face meeting?

19       A.    No, sir.   I just told him that I had had a

20   situation with a stalker.   Under absolutely no circumstances

21   whatsoever did I mention anything about her being a love

22   interest; having an interest in me; her being my even

23   neighbor.

24       Q.    Did you provide your resume?

25       A.    Yes, I provided my resume which he had already

1    received from MRI.

2         Q.    But you provided it to him personally?

3         A.    Yes.

4         Q.    When did you do that?

5         A.    I would have to look.  I don't have the exact date

6    in front of me.  I would have to look back because of the

7    month change as well.

8         Q.    Was it in February?

9         A.    It was in February of this year.

10        Q.    Middle of February; end of February; do you

11   remember?

12        A.    The beginning of February because we spoke late

13   January and beginning of February.

14        Q.    So, you provided your resume in February?

15        A.    Yes, February of this year.

16        Q.    Now, your first face to face meeting there is the--

17   I'm going to hand him the BB&T Investment Services pre-hire

18   questionnaire and CRD.  I believe it's also in your binder.

19   Just look at that, if you would.

20        A.    Yes, this is my handwriting.

21        Q.    Do you recognize these questions?

22        A.    Yes.  These questions are cut and paste from the

23   standard U-4 questionnaire.

24        Q.    Explain the U-4.

25        A.    It's a questionnaire where they do a preliminary

1  questionnaire about your background to see if basically there

2  are any red flags that would surface that would prevent you

3  from going forward in the employment process.

4      Q.    Question number five, can you read that?

5      A.    Have you ever been named in an arbitration or civil

6  litigation case.

7      Q.    What did you think that question meant?

8      A.    What I know it meant is have I ever engaged in

9  professional conduct that resulted in a client suing me and

10  or the firm.  That's a question-- I mean, I have answered

11  this question for every job I have ever applied for and this

12  is a standard question that I have seen since I got out of

13  school in 1989.

14      Q.    I'm going to hand you the Defendant's Memorandum In

15  Opposition Of The Plaintiff's Motion For A Temporary

16  Restraining Order.

17          There is a-- can you read the second to last

18  sentence beginning with Prior?

19      A.    Prior to extending an offer to Plaintiff, BB&T

20  asked Plaintiff in writing if he had been a party to any

21  arbitration or civil litigation.

22      Q.    Is that the same as the question that you were

23  asked?

24      A.    Absolutely not.  One is have you been sued and the

25  other is have you been involved in client related litigation.

44

1    Q.    So, why did you answer no to that question?

2    A.    Because I have never had anything but a compliment

3    letter sent to the firms that I worked with from clients.    I

4    have never had a complaint of any kind either verbally or

5    written.

6    Q.    Moving along, were you aware of the background

7    check going on?

8    A.    This would be the fourth firm I have worked for in

9    17 years.    So, I was well aware of the standard background

10    check which is why I was more than happy to give up

11    background information because I knew anything would surface

12    anyway.

13    Q.    During any of these initial meetings did you ever

14    tell Mr. Roccograndi about Merrill Lynch and the

15    circumstances surrounding your leaving?

16    A.    Absolutely.  I went into extremely great detail.

17    That's why the interview took two-and-a-half hours.    I made

18    it clear to him the big account I brought in.    I made it

19    clear to him that Merrill Lynch sometimes-- not Merrill Lynch

20    itself, but my manager had a process of abusing his

21    authority, for which he was eventually terminated from the

22    firm.

23           I made it clear the litigation went on and on and

24    had to be filed in different jurisdictions which is why the

25    arbitrators refused to listen to the complaint and forward it

1    to the Court.

2        Q.    Did you also tell them about -- so, was Mr.

3    Roccograndi aware of your window when you weren't employed in

4    the financial services industry and the circumstances

5    surrounding Merrill Lynch case?

6        A.    I made that clear that there was a hiatus-- I

7    referred to it as a sabbatical and I explained that.  That

8    was right up front.  I let them know why and I made no effort

9    to hide anything; that it was foolish know how transparent

10   the background check process is.

11       Q.    So, when were you actually-- did you actually first

12   receive an offer of employment?

13       A.    I received three phone calls in one day.  One was

14   from MRI, the search personal, had told me Mr. Roccograndi

15   had contacted her and said he was going to give me the offer

16   and then I received a phone call from Debbie Travers telling

17   me Mr. Roccograndi was going to and that same day I received

18   a phone call from Mr. Roccograndi extending the offer.

19       Q.    What day was this?

20       A.    This was--

21       Q.    Let's try it this way.  How many days before you

22   actually received the FedEx package?

23       A.    It was the day before I received the FedEx package.

24           MR. MALLOY:  I'm just going to hand you this and I

25   will hand one to your Honor.

1    BY MR. MALLOY.

2    Q.    When did you receive this letter that you're

3    holding?

4    A.    This letter was received the 22nd because I mailed

5    it the very next day.  I mailed it-- I'm sorry.  Strike that.

6    I mailed it the day I received it.  I sent it by registered

7    mail to Mr. Roccograndi's attention.

8    Q.    Looking at that letter, does that jar your memory

9    as to when you had received these three phone calls?

10    A.    Yes. I received these three phone calls on March

11    22nd; the day before I received this letter.

12    Q.    Could it have been possible you received the phone

13    calls on the 21st of March?

14    A.    Yes, it is possible because they verified my

15    address.  Ms. Travers verified my address and then sent me

16    the package the next morning.

17    Q.    Now, after you received this letter, what did you

18    do?

19    A.    I immediately tendered my resignation with Mass

20    Mutual Financial Services.

21    Q.    The day you received the letter?

22    A.    The day I mailed it.  It was the same day.

23    Q.    What did you do?

24    A.    That would have been the day I signed this which I

25    believe would have been the 24th.  Whatever date that my

1    signature is on the contract in which I accept.

2          Page two of this document would have my--

3    Q.    Do you recognize that document?

4    A.    Yes, this is the remainder of the contract package

5    and this is dated March 24th.

6          So, upon mailing Mr. Roccograndi the signed

7    document and retaining a copy because they sent me two

8    identical contracts, I retained one for my records and the

9    one that I signed I sent back registered mail and I

10   surrendered all my clients to Mass Mutual so that there would

11   be a smooth transition.

12         I also declined other job offers that were pending.

13   I had other items, but this was an Ideal-- almost a dream

14   opportunity and so I took all other opportunities off the

15   table.

16         Those opportunities were only lucrative as long as

17   I maintained a client base, which I surrendered.

18   Q.    Were you ever told by BB&T that your job no longer

19   existed for you?

20   A.    I was initially told it was in trouble because of

21   the Towson incident that happened in 1986 or '87.

22   Q.    When were you told this?

23   A.    By Mr. Roccograndi in a phone call on a Friday

24   before I retained you guys for this case.  I explained.  It

25   would have been about April 5th of 6th.

1    Q.    Okay.

2    A.    I was told an incident had surfaced.

3    Q.    Hold on.  Do you remember when you were supposed to

4    begin orientation?

5    A.    I was supposed to fly down on Sunday.  No, I'm

6    sorry.  That was Easter.  It would have been Monday, April

7    17th.

8         I was supposed to fly down that Monday, but I was

9    to begin going through some type of orientation a week

10   earlier on April tenth.

11   Q.    So, when did you actually retain an attorney?

12   A.    I retained you guys on a Thursday which would have

13   been April 14th.

14   Q.    So, when did you get-- let me back up a little bit.

15   When did you get-- when were you first made aware you no

16   longer had a job at BB&T?

17   A.    April 14th.

18   Q.    Were you made aware any time before that?

19   A.    I was told it was in jeopardy due to an incident

20   that happened when I was a sophomore in Towson.

21   Q.    An earlier day?

22   A.    Yes, on April 5th or 6th he called me.

23   Q.    And by he you mean who?

24   A.    Mr. Roccograndi called me and I explained to him

25   that anyone in possession of that document was in violation

                                                    49

1  of a court order because the case had been expunged and I

2  explained to him details surrounding the Campus Security

3  officer who was involved in a car theft ring that I, along

4  with two other students, videotaped and presented to the

5  University President and--

6      Q.   Hold on.  We will get to that later, maybe.

7      During that April 5th or 6th telephone

8  conversation, how did he tell you your job no longer existed

9  or it was in trouble?

10      A.   He told me he was going to have his boss speak--

11  well, his exact words were the Compliance Chief and he

12  mentioned her name-- who she happens to be sitting here-- but

13  he said she had made a decision she did not want me to start

14  and he felt she was being unreasonable, but he was risking

15  his job by getting his boss involved to try to explain to her

16  that this was an innocent incident where I was a victim.

17      Q.   Did you still believe you were going to be starting

18  work on time?

19      A.   Yes.

20      Q.   Were you aware of whether your background-- strike

21  that.  What was going on with Mass Mutual at that time?

22      A.   I was making a quiet transition.  I had already

23  begun cleaning out my office; all my clients had been

24  reassigned; all prospective clients had been reassigned;

25  current clients had been reassigned.

1    MR. MALLOY:  I have no further questions, your

2  Honor.

3    THE COURT:  All right.  Cross.

4    MR. BRIGGS:  Thank you, your Honor.

5    CROSS EXAMINATION

6    BY MR. BRIGGS:

7    Q.  I have a few questions, Mr. Owen-Williams?

8    A.  Sure.

9    Q.  On the prehire form that you filled out for Mr.

10  Roccograndi--

11    A.  I have one in my hands if you--

12    Q.  All right, sir.  On that form, the fifth question

13  is "Have you ever been named in an arbitration or civil

14  litigation case;" is that correct?

15    A.  Yes.

16    Q.  And would it be accurate for me to say that between

17  1992 and today you have be involved in about a dozen

18  lawsuits?

19    A.  No.

20    Q.  Would it be accurate for me to say that in March or

21  in 1992 you were terminated from Merrill Lynch for anger

22  problems?

23    A.  No.

24    Q.  Were you terminated from Merrill Lynch?

25    A.  No. I attempted to transfer and the transfer never

1    went through. I attempted to go back to the D.C. office

2    because I had a bully for a boss, but my boss would not

3    approve the transfer and my position was terminated, but

4    Merrill never said I was fired.

5         Q.    And did you file a claim with EEOC?

6         A.    There are certain steps unfortunately you have to

7    go through.

8              MR. MALLOY:  I will have to object, your Honor.  I

9    knew this point would come.  After the TRO hearing, the

10   Defense dug up a bunch of pleadings from earlier lawsuits.

11              I would proffer that none of these were considered

12   during the hiring or firing process of Mr. Owen-Williams and

13   it's just an attempt to now justify actions that were taken

14   back then and I don't think any of it's relevant.

15              THE COURT:  And so you think that none of this is

16   relevant to your client's potential for ultimately prevailing

17   in this matter?  I'm not so sure of that.

18              MR. MALLOY:  I do think it would be relevant for

19   that matter.

20              THE COURT:  Well, since that's an element of this

21   proceeding.  I'm just hard put to find it's not relevant.

22              MR. MALLOY:  In the written order, there were

23   specific enumerated subjects that you wanted more information

24   referring to.

25              THE COURT:  Right.  I think I used the language,

1    though, including but not limited to.

2              MR. MALLOY:  You did use that language.

3              THE COURT:  All right.  So, I will overrule the

4    objection.

5              MR. BRIGGS:  Let me mark this as the next exhibit,

6    if I may.

7              BY MR. BRIGGS:

8         Q.   I will hand it to you, sir.  Exhibit number two for

9    today's hearing and I just specifically want to invite your

10   attention to the list of cases in this preliminary statement

11   here to see if this is an accurate list of some 13 or so

12   cases in which you have been involved.

13             THE COURT:  Well, I'm not going to--

14             MR. MALLOY:  Your Honor--

15             THE COURT:  Excuse me.  That is irrelevant.

16   Involvement?  Are you suggesting that the Plaintiff was a

17   party?

18             MR. BRIGGS:  Yes, sir.

19             THE COURT:  All right.  Then rephrase your

20   question.

21             MR. BRIGGS:  Thank you, your Honor.  I would just

22   like to refer to these as-- to inquire about cases to which

23   you have been a party.

24             BY MR. BRIGGS:

25        Q.   Specifically, I inquired about Merrill Lynch.  It's

1    accurate to say that after you left Merrill Lynch in 1992 you

2    pursued a claim with EEOC through arbitration; is that

3    correct?

4        A.    No, I did not.  They sued to go to arbitration.  I

5    pursued a claim based on their actions and it was transferred

6    to numerous jurisdictions.

7            What you have listed here are the various case

8    numbers that have been given to one complaint.  That is one

9    complaint that for ten years was bounced around to various

10   jurisdictions but, yes, I was involved in one litigation

11   which I was the Plaintiff.

12       Q.    So, you sued Merrill Lynch for relief from losing

13   your job there?

14       A.    No, sir.  I sued Merrill Lynch because my boss

15   stole a three-hundred-million dollar account from me.

16       Q.    And would it be also accurate to say that after

17   suing Merrill Lynch you then sued employees of Merrill Lynch?

18       A.    No.  My boss--

19           MR. MALLOY:  I would like to make a continuing

20   objection.  I don't know what that has to do with--

21           THE COURT:  The objection is noted.

22           BY MR. BRIGGS:

23       Q.    Would it be accurate to say you next sued the

24   employees of Merrill Lynch?

25       A.    No.  Judge Mersetti in Federal Court said the

54

1    employee-- my boss, Carl Meyer, his actions were responsible.

2    Merrill Lynch argued that the firm wasn't; Mr. Meyer was and

3    the case had to be again transferred to Circuit Court because

4    they said what occurred was not a matter of federal law; it

5    was a matter of state law.

6              That's how the case went from Judge Mersetti in

7    Federal Court to the Montgomery County Circuit Court.

8         Q.    Would it be accurate to say after that you sued the

9    Merrill Lynch lawyers, Miles & Stockbridge law firm?

10        A.    I brought to the Court's attention the fact that

11   the case was dismissed on fabricated evidence that Miles &

12   Stockbridge swore to.

13        Q.    And that lawsuit you filed against Miles &

14   Stockbridge was ultimately dismissed, was it not, by the

15   Court?

16        A.    Yes.

17        Q.    Would it be accurate to say that sometime

18   thereafter, Miles & Stockbridge and the lawyers at Miles &

19   Stockbridge filed a lawsuit against you seeking injunctive

20   relief to enjoin you from harassing, intimidating,

21   threatening, posting things in their neighborhood?

22        A.    That's not true.  The only thing they requested was

23   that I not publicly admit things about them that I learned

24   through the filings.

25        Q.    Would it also be accurate for me to say that the

1    court in Maryland entered an injunction against you enjoining

2    you against taking any such action against the lawyers of

3    Miles and Stockbridge?

4        A.    To my knowledge I was asked if I would stop

5    disseminating any public information and I agreed.

6            So, if anything, it was voluntarily but I don't

7    remember the details.  I just remember a judge asking me

8    would I be willing to volunteer to no longer distribute

9    information that I knew to be true.

10       Q.    And it would also be accurate for me to say that in

11   the Maryland Court, the Court also entered an order against

12   you in the Circuit Court for Montgomery County; an order

13   against you enjoining you from filing any--

14           Let me read it to be sure I state it accurately.

15   "It is ordered that Plaintiff, Adol Theo Owen-Williams,

16   Junior shall not be permitted to file any further pleadings

17   in this Circuit Court for Montgomery County Maryland without

18   prior leave of Court."

19       A.    In that instance, yes, because I felt that the

20   grounds upon which Miles & Stockbridge were able to get the

21   case-- they fabricated a filing date and got the case

22   dismissed on the statute of limitations and because of

23   whatever reason, the judge felt that my argument that the

24   false filing date was not enough reason to reinstate the case

25   and I respectfully disagreed and so I made an attempt to have

56

1    the case reinstated and he submitted that order and I

2    respectfully adhered to it, even though I respectfully

3    disagreed.

4            The reality is, sir--

5            MR. MALLOY:  There is no question.

6            BY MR. BRIGGS:

7        Q.    And if I understand correctly, it would be accurate

8    for me to say as well, would it not, that you did not reveal

9    and disclose to BB&T these prior lawsuits?

10       A.    I explained to Mr. Roccograndi that this was ten

11   years in litigation that cost hundreds of thousand of dollars

12   and a lot of pleadings went on and I went into detail about

13   some of the things that went on and, for the record, I also

14   recall when I went into this with him, he promised me that I

15   would never to have tolerate such behavior at BB&T.

16           His exact words were "What happened to you was

17   wrong and I can guarantee you we don't play those kind of

18   games here.  You never have to go through something like that

19   at BB&T."

20       Q.    Let me invite your attention to BB&T Investment

21   Services' Prehire Questionnaire.  Do you have that in front

22   of you?

23       A.    Yes, I do.

24       Q.    Let me invite your attention to the second page.

25   Do you see the second page there under the CRD Consent which

1    is in bold language?

2         A.    There is nothing in bold language.

3         Q.    Well, pardon me.  I didn't state that well.  That

4    language which is blocked out.

5         A.    Yes.

6         Q.    The last sentence there states "I understand should

7    I receive an offer of employment with BB&T Investment

8    Services the offer would be contingent upon the satisfactory

9    disclosure review as determined by the Compliance

10   Department."

11              Did I read that accurately?

12        A.    Yes, you did.

13        Q.    Is that your signature under that?

14        A.    Yes, it is.

15        Q.    Let me then ask you about the offer of employment

16   letter you received from BB&T.

17              Do you have that in front of you, sir?  Look behind

18   Tab Ten, the chronology.

19        A.    Yes, sir.

20        Q.    And is that the offer letter?

21        A.    Yes.

22        Q.    Let me invite your attention to the second

23   sentence.  It states "All employment offers are contingent

24   upon standard background checks, including educational and

25   employment records search, criminal record search.  NASD

1    Central Registration, responsive check and satisfactory

2    result of our company pre-employment substance abuse test."

3            Did I read that sentence accurately, sir?

4        A.    Yes.

5        Q.    And you understood that before you signed that

6    letter; did you not?

7        A.    Yes.

8        Q.    And attached to that letter was identified and

9    titled Protective Covenant Agreement; is it not, sir?

10       A.    Yes.

11       Q.    And you understood that was an offer of an

12   employment contract for a position with BB&T which was an at

13   will employment; did you not, sir?

14       A.    Yes.

15       Q.    And you understood they could fire you at any time

16   for whatever reason or you could leave at any time for

17   whatever reason.

18       A.    Yes.

19            MR. BRIGGS:  I don't have any further questions,

20   your Honor.  Thank you.

21            THE COURT:  Any redirect?

22                    REDIRECT EXAMINATION

23       BY MR. MALLOY:

24       Q.    At the time you signed the employment contract with

25   BB&T, you were still employed at Mass Mutual?

1      A.    Yes, I was.

2      Q.    Did you quit on that date?

3      A.    I submitted my resignation letter the day I

4  submitted my acceptance of the contract and I did so

5  realizing that I had been offered a job and I did so

6  realizing that there was nothing that I didn't disclose that

7  would have prevented me from taking the job.

8          THE COURT:  Excuse me, Mr. Malloy.  On April 21st I

9  think Mr. Owen-Williams testified that on March 23rd he

10  e-mailed his employer and he essentially authorized the

11  reassignment of his clients and so I think the record from

12  the 21st and today is very complete as to the steps Mr.

13  Owen-Williams took in reliance on the offer of employment and

14  his acceptance of the offer of employment.

15          I think the record is complete in that regard.

16          MR. MALLOY:  Okay.  I don't have any further

17  questions.

18          THE COURT:  All right.  Fine.

19          Well, gentlemen, I think I have really heard all of

20  the testimony that I need to hear.

21          Mr. Malloy, Mr. Briggs, I will give you each about

22  five minutes to summarize your position as to the temporary

23  restraining order.

24          Keep in mind that I recall your positions-- your

25  arguments before.

1      I assume that essentially they're the same, but if

2  there's any refinement or expansion that is appropriate, now

3  is your opportunity.

4      MR. MALLOY:  Your Honor, if I may, would it be okay

5  if I shortened my summation and reserve a minute or two in

6  case I would like to respond to anything from Mr. Briggs?

7      THE COURT:  Yes.

8      MR. MALLOY:  Our argument-- I don't think the facts

9  have essentially changed much from the last time we were in

10  here with the exception of some dirt that was dug up to be

11  thrown at my client.

12      I mean, there are two competing orders in front of

13  your Honor.  One of them which we would like to be is to

14  install Mr. Owen-Williams in his position.

15      If you're not so inclined to do that, we would

16  respectfully request you consider the other one.  To keep the

17  employment position open.

18      THE COURT:  Let me ask you this.  Have you found a

19  single case to support the suggestion that it's likely that

20  the Court will ultimately order that Mr. Owen-Williams be

21  hired by BB&T because it seems to me that, frankly, that

22  eventuality is extremely remote and I'm not talking about

23  reinstatement of employees who have been discharged.  I'm

24  speaking of the directive whereby the Court has required an

25  employer to hire someone it otherwise would not be inclined

1    to hire.

2                   Do you have a case or authority for that?

3              MR. MALLOY:  Your Honor, I do not have a District

4    of Columbia case.

5              THE COURT:  Do you  have a case from any

6    jurisdiction?

7              MR. MALLOY:  I have a District of Columbia case

8    involving the Government where an employee who was fired, the

9    Government was ordered to rehire.

10             THE COURT:  That's a little different because when

11   you order the rehiring of an employee, you at least have some

12   background to measure the compliance of the order, but if the

13   Court were to order the hiring of a person who had not

14   previously been employed, it seems to me that would be an

15   extremely difficult order to enforce, particularly in an at

16   will hiring situation.

17             So, I tell you now that I find it extremely un-

18   likely that your client will prevail in terms of a

19   preliminary or permanent injunction to that effect.

20             MR. MALLOY:  Your Honor, I would submit in the

21   District of Columbia the most important factor in a TRO or

22   injunction test is irreparable harm to the Plaintiff.

23             Also, I think this should be weighed against the

24   minimal injury to BB&T and I found a case-- it's a Fourth

25   Circuit Court of Appeals case, but it's kind of-- I think it

1    does a good job of outlining kind of the inner relation

2    between these factors and actually sites another case,

3    Blackwelder, and I think I have included in my motion--

4            I will just read a very brief excerpt. Blackwelder

5    directs the District Court to consider first the likelihood

6    of irreparable harm to the Defendant as balanced against

7    the-- if the balance is struck in favor of the Plaintiff and

8    it's enough that grave or serious questions are presented and

9    the Plaintiff did not show a likelihood of success.

10           Conversely, a weaker showing of the likelihood of

11   irreparable injury will necessitate a stronger showing of

12   probable success and if the irreparable injury is merely

13   possible probability of success, it may be decisive.

14       THE COURT:  All right.  Well, I agree that

15   certainly that is one prerequisite you must essentially show

16   that the granting of a temporary restraining order would not

17   tend to harm the Defendant more than the denial would harm

18   your client.

19           The balancing of equities are a prerequisite.  So,

20   certainly that is in this jurisdiction as well as the Fourth

21   Circuit and I suppose most jurisdictions factor in

22   consideration.

23       MR. MALLOY:  I would also submit in Defendant's

24   opposition they mention how the Court disfavors involuntary

25   servitude and I think this case is different.

63

1    I don't think it's forcing a situation of

2 involuntary servitude when you're forcing an employer to take

3 back an employee.

4    The Government is forced to do it many times.

5 Courts in equity regularly do this.

6    THE COURT:  Well, I agree this is not an

7 involuntary servitude situation.  It would be that situation

8 if BB&T said "Well, this man said he would work for us and

9 now he doesn't want to come and work for us.  So, we're

10 asking the Court to order him to come and work for us."

11    That would be involuntary servitude.  So, certainly

12 we don't have that situation here.

13    MR. MALLOY:  I mean, the posture of the case I

14 don't think is too different than it was the last time.  Some

15 of the dates are a little different.  My client understood on

16 April 14th he no longer had a job.  He firmly understood that

17 not any time before.

18    I think it's entirely reasonable he was offered the

19 job on the 21st of March.  I think it's unreasonable that,

20 you know, after he was offered the job and accepted and gave

21 up his employment at his current job and all of his current

22 clients, almost a month later he was told he no longer had a

23 job.

24    I mean, that's not the irreparable harm to him.

25 The irreparable harm is the mark on his reputation that can

1    no longer be erased.  No amount of money can fix it, but

2    considering the amount of irreparable harm to my client and

3    the minimal damage or injury that BB&T would suffer, I think

4    it's reasonable that this Court grant the second order at

5    least ordering BB&T to hold the position open.

6         This is a specific position.  There can't be two of

7    them.  It's a person in charge over all of the-- a certain

8    investment area in the District of Columbia.  You can't

9    create another position like that and if it's allowed to be

10   filled, it would forever foreclose on my client's ability to

11   be put in that position or have his grievance redressed and I

12   know at this juncture it may not be completely clear whether

13   my client will be able to win on the merits.

14        We think we have a good case and I think at this

15   point this Court could enter an injunction for the duration

16   of the litigation ordering BB&T to not fill that position.

17        THE COURT:  Well, there are four factors that the

18   Court has to consider.  One is the public interest.

19        I don't see that the public interest is really at

20   issue in this case one way or the other.  So, that leaves

21   three factors.  Substantial likelihood that your client will

22   ultimately prevail.

23        My view in that regard is essentially the same as

24   was the case on April 21st.  That I am not able to find a

25   substantial likelihood that your client will prevail.

1    Certainly not with respect to injunctive relief.

2         In other words, I think I indicated previously that

3    I think it's highly unlikely that this Court will ultimately

4    order the Defendant to employee him.

5         As to monetary damages, that's another issue, but

6    they're monetary and not irreparable and so I find that the

7    issuance or not of a temporary restraining order will not

8    affect the potential for irreparable harm.

9         To the extent that this disagreement, this recision

10   or attempted recision of a contract, an employment offer,

11   rather, may harm your client's professional reputation, I

12   think that that's going to be an issue that your client will

13   have to address in terms of future employment regardless of

14   whether a temporary restraining order is issued or not.

15        So, to the extent the harm to your client is

16   monetary, it's not irreparable and to the extent that he

17   might have been harmed in a way that is irreparable in terms

18   of his reputation, that cannot be prevented by the issuance

19   of a temporary restraining order at this juncture.

20        In balancing the equities, I'm hard put to say that

21   your client would incur more harm though or as a result of

22   the failure to issue a temporary restraining order than the

23   Defendant would incur if such an order were issued.

24        Whatever harm, whatever damage your client has or

25   will incur I think can be quantified monetarily.

1    I think it would be much more difficult to quantify

2  the potential damage to the Defendant if the Defendant were

3  precluded for weeks or months into the future from filling

4  this position.

5    So, I think in terms of all three of those

6  prerequisites, the petition for a temporary restraining order

7  fails and so for those reasons, I'm compelled to deny your

8  request for a temporary restraining order.

9    All right.  Thank you.

10    MR. BRIGGS:  Here is our draft order.  I'm happy to

11  submit a new one, if you would like.

12    THE COURT:  That won't be necessary.  I will submit

13  an order.

14    Now, gentlemen, as to these exhibits they have been

15  marked, but frankly none have been submitted as part of the

16  record and I don't think it's necessary because I think the

17  record will speak for itself as to the pertinent parts of

18  these exhibits.

19    They're available to both parties.  They will be

20  preserved by the parties to the extent they're necessary for

21  future hearings.

22    So, I will order you retain the exhibits necessary

23  for this hearing.  Thank you.

24    (Proceedings adjourned at 11:45 a.m.)

25

1

## CERTIFICATE OF REPORTER

2

3          I, Donna K. Hawkins, an Official Court Reporter for

4    the Superior Court of the District of Columbia, do hereby

5    certify that I reported, by machine shorthand, in my official

6    capacity, the proceedings had and testimony adduced upon the

7    hearing in the case of the ADOL OWEN-WILLIAMS, Plaintiff

8    versus BB&T INVESTMENT SERVICES, INC. Defendant, Civil Action

9    Number 3084-06, in said court on the 8th day of May, 2006.

10          I further certify that the foregoing 67 pages

11    constitute the official transcript of said proceedings, as

12    taken from my machine shorthand notes, together with the

13    backup tape of said proceedings.

14          In witness whereof, I have hereto subscribed my

15    name, this the 9th day of May, 2006.

16

17

18

19    _____
                 DONNA K. HAWKINS
20              Official Court Reporter

21

22

23

24

25